### In re STEWART.

#### (District Court, N. D. New York. April 14. 1910.)

1. ELECTION OF REMEDIES (§ 11)—ACTS CONSTITUTING ELECTION—KNOWLEDGE OF FACTS.

An election of remedies between two causes of action, the one on contract and the other for fraud, presupposes a knowledge of the existence of the facts giving a right of action in tort for the fraud.

[Ed. Note.—For other cases, see Election of Remedies, Cent. Dig. § 14; Dec. Dig. § 11.*]

2. BANKRUPTCY (§ 140*)—PROPERTY PASSING TO TRUSTEE—RIGHT TO RECLAIM—DEPOSITS FRAUDULENTLY RECEIVED BY BANKER.

To establish fraud on the part of a banker which will entitle a depositor to rescind the deposit contract and recover his deposits from the banker's trustee in bankruptcy, the depositor must show that the bankrupt was insolvent when he received the deposits and knew it, while the depositor did not know it.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 219; Dec. Dig. § 140.*]

3. BANKRUPTCY (§ 336*)—CLAIMS AGAINST ESTATE—RIGHT TO WITHDRAW—DISCOVERY OF FRAUD.

A creditor who was in fact deprived of his property through the fraudulent acts of a bankrupt of which the creditor was ignorant, and who

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

only discovers it on the examination of the bankrupt after he has proved his claim as a general creditor, is not estopped to then withdraw his claim and reclaim his property, and he may do so as a matter of right.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 524; Dec. Dig. § 336.*]

4. BANKRUPTCY (§ 336*)—CLAIMS AGAINST ESTATE—RIGHT TO WITHDRAW—LACHES.

A delay of two months by a creditor of a bankrupt after discovering the facts which entitled him to withdraw his claim and reclaim his property on the ground of fraud was not such laches as to deprive him of the right, where no dividends had been paid in the meantime and no one was prejudiced by the delay.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 524; Dec. Dig. § 336.*]

5. BANKRUPTCY (§ 140*)—PROPERTY PASSING TO TRUSTEE—DEPOSITS FRAUDULENTLY RECEIVED BY BANK.

Where a claimant deposited money in the private bank of a bankrupt at a time when the latter was insolvent and knew himself to be so, although claimant did not, a trust for the benefit of claimant was impressed on the general fund with which his deposits were commingled and followed that fund so long as it was never exhausted but remained greater than the amount of his deposits and finally came into the hands of the trustee, and entitles claimant to reclaim his deposits, even though it affirmatively appears that the general fund was kept up by the deposits of subsequent depositors who did not draw out their deposits and have not been paid.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 219; Dec. Dig. § 140.*]

6. BANKRUPTCY (§ 473*)—COSTS—PROCEEDINGS AFTER ADJUDICATION.

Claimants having claims against the estates of bankrupts must establish them at their own expense, and will not be allowed their costs and expenses from the estate, where it does not appear that the defense made by the trustee was captious or unwarranted.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 873–877; Dec. Dig. § 473.*]

In the matter of Walter H. Stewart, bankrupt. On petition of Thomas H. Mitchell for an order of this court directing the trustee to pay to him the sum of $231.11, as moneys in the hands of the bankrupt and of the trustee after his appointment belonging to the petitioner. Petition granted.

Edward C. Hyle, for claimant.
Barnum & Wells, for trustee.

RAY, District Judge. On the 30th day of September, 1908, Walter H. Stewart, a private banker at Chittenango, Madison county, N. Y., filed his voluntary petition in bankruptcy, accompanied by the proper schedules, and he was adjudicated a bankrupt accordingly. On the 20th day of October, 1908, Frank R. Lenox was duly appointed trustee of the estate of said bankrupt, and he duly qualified as such and took possession of the bankrupt's property. When the bankrupt closed the doors of his bank, September 26, 1908, he had on hand in cash, of deposits, or whatever represented deposits, only $722.67. Of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

this sum the bankrupt paid his attorney for services in the bankruptcy proceedings $225 and retained $10. The balance, $487.67, came to the hands of the trustee.

On the morning of August 15, 1908, the petitioner, Thomas H. Mitchell, had no deposit in Stewart's bank. On that day and up to and including September 25, 1908, he made the following deposits: August 15th, $154.18; August 29th, $123.85; September 8th, $185.35; September 9th, $25; September 15th, $104.08; and September 25th, $89.59. Between August 15, 1908, and September 25th, he drew 15 checks on this account payable to different parties, all of which were paid except one of $15, dated September 12th, and one of $113.17 dated September 23d. The amount drawn by the checks paid was $450.94, leaving due $231.11. The books of the bankrupt are in evidence, from which it appears that others made deposits and drew checks during this time. These deposits were made in the usual way and commingled with the other moneys of Stewart received on deposit in usual course of business so as to be incapable of identification.

When these deposits were made by Mitchell, Stewart was hopelessly insolvent, and he had been insolvent for more than a year, and these facts Stewart well knew; but Mitchell was ignorant of such insolvency when he made the deposits, and remained ignorant thereof until about the 5th day of November, 1908, when the truth was disclosed by an examination of the bankrupt. Mitchell learned of Stewart's insolvency at the time he closed his doors, but did not learn the fact that Stewart received such deposits when insolvent, and knowing he was insolvent, until the date mentioned. There is no evidence that the other depositors mentioned, except two who have like proceedings pending, did or did not know Stewart was insolvent when they made their deposits. The evidence is silent on that subject.

Knowing that Stewart was insolvent when he closed his doors, and supposing all the checks drawn on his account with Stewart had been paid, but in ignorance of the fact that Stewart was insolvent when the deposits were made and knew the fact, Mitchell made his proof of claim for $102.94, and filed same October 20, 1908, with the referee to whom the matter had been referred in due course, and same was allowed. An examination of the bankrupt was had, and the truth was disclosed November 5, 1908. Thereupon, but thereafter, and on the 25th day of January, 1909, Mitchell gave notice that he withdrew his claim. He elected to rescind his contract of deposit and reclaim his money on the ground of fraud. Notice was also served on the trustee. The referee made an order that such claim should not or could not be withdrawn. This was not appealed from. No formal application was made for leave to withdraw. No dividend has been declared, so nothing has been paid on the claim.

Thereupon, and on the 8th day of February, 1909, Mitchell obtained from this court an order to show cause why his claim should not be paid in full from the assets of the estate of the bankrupt, or from the money on deposit at the time Stewart closed his doors. On the return thereof the matter was sent to a special master to take the evidence

178 F.—30

and report same to the court, with his findings and conclusions for the information of the court. This was in no way a reference for the trial or determination of the question presented, but simply to inform the court.

After Mitchell made his last deposit, September 29, 1908, of $89.59, others made deposits, five in number, to the amount of $167.56; but of this $19.58 was exchange or earnings of the bank, $20 was drawn out the same day, and $44.76 came from the Chase National Bank, a correspondent and depositary. I think it clear that the $722.67 on hand included the $89.59 deposit of Mitchell made September 25, 1908.

The trustee claims:

(1) That, having filed his proof of claim, Mitchell could not thereafter withdraw it without the consent of the referee.

(2) That the filing of such claim was a waiver of the fraud and an election to stand on the deposit contract which created the relation of simple debtor and creditor.

(3) That, even if he could withdraw his claim and rescind the contract of deposit and recover same, he cannot do this in such a case as this, unless he identifies the money on hand at the closing of the doors of the bank as his money, or as including his money or its proceeds, or some part thereof, in which case he can only recover the part shown to be on hand.

(4) That Mitchell was guilty of laches in rescinding, or attempting to rescind, after he knew all the facts.

(5) That it would be grossly inequitable to allow one depositor to get his money in full from the balance on hand when others during the same time had made deposits under the same circumstances and had not drawn same. That this would be taking the money of the other depositors to pay this particular depositor or the three who have rescinded and taken proceedings to recover the balance of deposit in full.

In answer to the last proposition the petitioner says: (1) The other depositors have not rescinded and taken steps to recover their deposits on the ground of fraud, but have elected to stand on the deposit contract; and (2) that there is no proof that the other depositors did not know, when they made their deposits, that Stewart was then insolvent. The contention is that the burden is on one seeking to rescind his contract of deposit and recover it to show affirmatively the deposit, insolvency at the time, and knowledge of such insolvency by the banker receiving the deposit, and also ignorance of such insolvency by the depositor; that there is no fraud unless the banker knew he was insolvent when he received the deposit, and the depositors were ignorant of such insolvency at the time of making the deposit. As to the deposits made by Mitchell between August 15, 1908, and September 15, 1908 (which excludes that of September 25, 1908, of $89.59), the evidence fails to show that no part of them were on hand when the doors were closed September 26, 1908, although that seems the probable fact.

The following table shows cash on hand September 8, 1908, and the receipts and payments down to and including September 26, 1908, viz.:

| Dates 1908 | | Received | Paid | Balance |
|---|---|---|---|---|
| Sept. 8, | on hand.................... | $4,553 56 | | |
| " 8 | .......................... | 4,038 04 | $1,071 37 | $4,520 23 |
| " 9 | .......................... | 1,725 88 | 2,002 05 | 4,244 06 |
| " 10 | .......................... | 1,162 54 | 1,207 47 | 4,199 13 |
| " 11 | .......................... | 384 62 | 594 64 | 3,989 11 |
| " 12 | .......................... | 4,018 43 | 3,707 89 | 4,299 65 |
| " 14 | .......................... | 3,073 55 | 2,507 49 | 4,865 71 |
| " 15 | .......................... | 2,214 34 | 2,163 45 | 4,916 60 |
| " 16 | .......................... | 367 72 | 374 49 | 4,909 83 |
| " 17 | .......................... | 430 19 | 518 65 | 4,821 37 |
| " 18 | .......................... | 2,055 96 | 2,595 90 | 4,480 43 |
| " 19 | .......................... | 1,359 05 | 2,574 51 | 3,264 97 |
| " 21 | .......................... | 3,630 82 | 3,690 08 | 3,205 71 |
| " 22 | .......................... | 379 07 | 484 28 | 3,100 50 |
| " 23 | .......................... | 2,230 47 | 1,623 91 | 3,707 06 |
| " 24 | .......................... | 640 29 | 883 20 | 3,464 15 |
| " 25 | .......................... | 705 21 | 900 05 | 3,286 16 |
| " 26 | .......................... | 89 34 | 2,636 98 | 738 52 |

It is true that when a person has two inconsistent remedies he may elect which he will pursue, and the election, once fully made, cannot be retracted. But an election of remedies presupposes knowledge of the two remedies, and, as between two causes of action, the one on contract and the other for fraud, a tort, the rule presupposes a knowledge of the existence of the facts giving a right of action in tort for the fraud.

"Any decisive act by a party with a knowledge of his rights and of the facts determines his election in the case of inconsistent remedies." Robb v. Vos, 155 U. S. 13, 15 Sup. Ct. 4, 39 L. Ed. 52.

In this case there is evidence that Mitchell suspected, at least, the insolvency of Stewart prior to his actual failure, but not that he actually knew it, and the evidence establishes affirmatively that Mitchell did not know that Stewart knew he was insolvent when he received these deposits until November 5, 1908, some 15 days after he had filed his claim in these bankruptcy proceedings and secured its allowance.

To give Mitchell the right to rescind the deposit contract and proceed on the ground a fraud had been practiced, and that he was therefore entitled to his money deposited, less that drawn out, it was necessary that he be able to establish not only the insolvency of Stewart when the deposits were made and received, but that Stewart then knew he was insolvent and that Mitchell did not. The fraud consists in receiving a deposit when hopelessly insolvent with knowledge of the fact and concealing that condition from the innocent depositor. St. Louis & Francisco R. Co. v. Johnston, 133 U. S. 566, 576, 10 Sup. Ct. 390, 33 L. Ed. 683; Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537, 52 Am. Rep. 9; Anonymous Case, 67 N. Y. 598; Cassidy v. Uhlmann, 170 N. Y. 505, 515, 63 N. E. 554; Atkinson v. Rochester, etc., 114 N. Y. 168, 175, 21 N. E. 178.

In St. Louis, etc., v. Johnston, supra, the court said, citing and approving the New York cases:

"When a bank has become hopelessly insolvent, and its president knows that it is so, it is a fraud to receive deposits or checks from an innocent depositor, ignorant of its condition, and he can reclaim them or their proceeds."

Also in effect that it is a wrong not to disclose such insolvency to a depositor, and that where a bank, knowing its insolvency, continues to do business and receive deposits, it represents itself as solvent. To the same effect is Cassidy v. Uhlmann, 170 N. Y. 505, 515, 63 N. E. 554, and many other cases. It is, of course, true that when Mitchell · proved his claim he made himself a party to the bankruptcy proceedings, and he is now in this court seeking to establish a lien on the moneys of the bankrupt in bank at the time of the failure on the ground they include his money or deposits, and that the title. is in him, and that he is entitled to an order directing the trustee to pay them over to him as the rightful owner. He claims that he has never made a legal election to pursue his remedy by proving his claim as a debt for the reason he was ignorant of the facts and of his rights, and that his right to withdraw the claim proved is one of which the court cannot deprive him; that he has neither received a dividend nor done any act since informed of the facts which can be construed as a waiver of his right to stand on the fraud or as an election to stand on the claim presented and allowed; and that nothing has been done by him at any time that in any way prejudices the rights of other creditors or that has misled them or the trustee.

I do not think it in accord with equity or good conscience to hold that a creditor of a bankrupt who has been in fact deprived of his property by the fraudulent acts of the bankrupt of which the creditor was ignorant, and who presents his claim as for goods sold and delivered at the first meeting of creditors, and then on a full examination of the bankrupt discovers the fraud, and that he is entitled both in law and equity to a return of his property, is estopped from withdrawing his claim as proved and allowed and proceeding to reclaim the property itself. I do not think it within the power of the court, or referee, to prevent such withdrawal or abandonment of the claim presented. The withdrawal is a matter of right in the creditor, and not a matter of discretion with the referee or judge. This is in accord with Standard Oil Co. of Ky. v. Hawkins, 74 Fed. 395, 20 C. C. A. 468, 33 L. R. A. 739, a case that has been frequently cited and approved. It was there held:

"When a party who has a choice of two remedies pursues one of them under the mistaken impression that the law affords him no other, and in ignorance of the existence of the other and more advantageous remedy, equity, in the absence of injury to others, or of facts creating an estoppel, may relieve him from the apparent election made under such mistake, and permit him to pursue the more advantageous remedy."

The bankruptcy court is a court of equity and guided and controlled by equitable doctrines and principles.

In Smith v. Savin et al., 141 N. Y. 315, 323, 36 N. E. 338, the plaintiff proceeded on his original complaint on the theory of a sale of certain stock at a certain sum, etc. He did not learn until the case was at issue and referred that the stock was not legally sold. Even then he went to trial, and judgment was rendered against him; but this was reversed on appeal. He then asked to amend his complaint and set up the illegal sale and demand damages. The defendant claimed that by his original complaint and going to trial the plaintiff had elected

to affirm the sale. This the Court of Appeals held untenable, that, as he made his original complaint in ignorance of the facts, he could not be held to have conclusively ratified the illegal sale of the stock. Here, the claim was proved and allowed for an amount less than was actually his due, and, as he subsequently discovered that two checks had not been paid, he was entitled to present a new claim and withdraw his old one or amend, and, as he subsequently discovered the fraud, he was also entitled to base his claim on the facts as he found them to be and proceed accordingly and rescind the deposit contract because of the fraud.

In Importers' & Traders' National Bank of N. Y. v. Peters, as Receiver, 123 N. Y. 272, 279, 25 N. E. 319, in the course of the administration of the assets of a bank by its receiver the respondents presented to the receiver and proved a claim as creditors including a certain draft and received a dividend. The facts were that such a fraud had been perpetrated by the bank that the said creditors were entitled, as here, to recover the draft or its proceeds; but of these facts constituting the fraud the said creditors were ignorant when they presented and proved their claim including the draft as on contract. It was held that this action, because of such ignorance of the facts constituting the fraud, did not preclude them from proceeding for the draft, or its proceeds, on restoring what had been received.

E. C. Foundry Co. v. Hersee, 103 N. Y. 25, 9 N. E. 487, is to the same effect. If actual proof and allowance of a claim and payment and acceptance of a dividend does not bar a rescission or constitute an irrevocable election when the party proving the claim is ignorant of the facts constituting the fraud, and which fraud gives the right to rescind the contract and recover the property obtained, I am unable to see how a mere proof and allowance of a claim in bankruptcy for a part of the actual claim (induced in a measure by the same fraud) bars the withdrawal of such claim and a resort to the remedy growing out of the fraud. I am not aware of any provision in the bankruptcy law that precludes such action.

In Re Baxter, 12 Fed. 72 (1882), under the former bankrupt law, Judge Brown held:

"Proof of debt, made under a mistake of fact or law, may be amended or withdrawn, if no action has been based upon such proofs which cannot be recalled or compensated."

This case is cited with approval by the Supreme Court of the United States in Hutchinson v. Otis, 190 U. S. 552, 23 Sup. Ct. 778, 47 L. Ed. 1179, and by the Circuit Court of Appeals, Second Circuit, in Re J. M. Mertens & Co., 147 Fed. 181, 77 C. C. A. 473. There are numerous authorities to the same effect, but it is not necessary to cite them.

As to laches, something over two months elapsed after discovery of the facts constituting the fraud before the claimant here took decisive steps to withdraw his claim and take this proceeding. I hardly think this can be held laches. Clearly no one was harmed; no one changed his position. The trustee did not distribute the estate, and neither he nor the creditors, or any one of them, has changed his position for the

worse. Practically the matter stands where it did when the trustee was elected. I regard it immaterial whether or not Mitchell took part in electing the trustee. His vote did not determine that question. It was necessary for Mr. Mitchell to consult counsel, examine the law, and prepare and serve notices and papers. I do not think the delay, under all the circumstances, was unreasonable. In equity cases it has been held that a delay of months, and even years, in some cases, is not such laches as will bar recovery or the equitable remedy.

The real question is: Is Mitchell in this proceeding entitled to his full claim, the balance of his deposits, or to the $89.59 only?

This is not the case of a person having trust funds in his possession or keeping which he deposits in his personal bank account commingling them with his own personal funds and then drawing personal checks against it for his own benefit. In such case it is presumed that he draws out his own money and leaves the trust money undisturbed. Importers' & T. N. B. v. Peters, 123 N. Y. 272, 25 N. E. 319. So, if he draws it all, and then makes a deposit of his own money, it is presumed he restores the trust fund or money. So if, having trust money and a trust account which he keeps in his own name, he uses the trust money for his own purposes, but later puts an equal amount of his own money in such trust account, it becomes trust money. Baker et al. v. N. Y. Nat. Ex. Bank, 100 N. Y. 31, 34, 2 N. E. 452, 53 Am. Rep. 150; Van Alen v. Am. Nat. Bank, 52 N. Y. 1.

If A. steals, or by fraud obtains, the oats or moneys of B., and commingles them with his own so they cannot be distinguished or identified, B. may take from the common mass in proper proceedings. But if A. steals, or by fraud obtains, the oats or money of B. and those of C. and those of D., and then feeds out the oats of B. or spends his money, it would not be equitable to hold that B. may reimburse himself from the oats or money of C. and D. unless they abandon all claim to their property and sue as for goods sold and delivered or money had and received waiving the tort. Even in such a case to allow B. to take the oats remaining or any part of them, or the money, would be to hold that the presumption is A. had substituted the oats or money on hand for those fed or paid out. This would be a violent presumption.

In this case I cannot find as a fact that Stewart had any part of the deposits of Mitchell in his bank when he closed his doors except the $89.59, and there is no proof of a substitution of money or property to take the place of the money deposited by Mitchell and paid out in regular course of business. Neither can I find as a fact that they were not in the bank mingled with the other funds. The claimant has not proved the deposits were there. With few exceptions Stewart was daily paying out more money than he received on deposit. The money deposited in a bank becomes the property of the bank and must be so considered until the contract of deposit is rescinded by the depositors for fraud. This applies to all the moneys deposited, but only three depositors have rescinded and shown that the fraud affected them. There is a rule which applies the first drawings out to the first pay-

ments in. If that rule is applicable here, I should not be compelled to find that all of the money of Mitchell except the $89.59 was paid out some days before the bank closed its doors. There are cases where the rule does not apply. Importers' & Traders' National Bank of N. Y. v. Peters, as Receiver, etc., 123 N. Y. 272, 279, 25 N. E. 319; National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693.

If the moneys deposited by Mitchell from time to time are to be treated as held in trust by Stewart, impressed with a trust from the time of deposit, and it can be held or presumed that he recognized the trust, then it can be said that the balance in bank when the doors closed represented that trust fund or included it. If, on the other hand, that did not occur, but equity may impress the balance on hand with a trust for the benefit of Mitchell, he having rescinded the deposit contract, then he is entitled to the whole sum due. No decree for the full amount can pass in favor of Mitchell on the theory the deposits fraudulently obtained by Stewart have been followed and identified as part of a gross sum, for, except as to the last one of $89.59, they have not been so identified. The proof fails to show that any of Mitchell's money, except that mentioned, remained in the bank. The moneys deposited by Mitchell were not trust funds in his hands, or moneys held by him in any fiduciary capacity, but his own. Hence such cases as Importers' & Traders' Nat. Bank v. Peters, 123 N. Y. 272, 25 N. E. 319; National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693; Union Stock Yards Bank v. Gillespie, 137 U. S. 411, 11 Sup. Ct. 118, 34 L. Ed. 724; Baker v. N. Y. Nat. Ex. Bank, 100 N. Y. 31, 2 N. E. 452, 53 Am. Rep. 150; Standard Oil Co. of Ky. v. Hawkins, 74 Fed. 395, 20 C. C. A. 468, 33 L. R. A. 739; In Matter of Holmes, 37 App. Div. 15, 55 N. Y. Supp. 708, affirmed 159 N. Y. 532, 53 N. E. 1126—have no application on this branch of the case.

True, because of the fraud Mitchell did not part with his title to the deposits; but, if he cannot follow and identify such deposits as being a part of the funds that came to the hands of the trustee, on what principle is he entitled to a lien on the other moneys or property of the bankrupt? Is it the law that identification of deposits in a bank, either the identical money, or the money deposited commingled with other money of the bank (in cases where the deposit was not a trust fund in the hands of the depositor), is unnecessary, and that in such cases the law impresses whatever is found in the bank with a trust for the benefit of the defrauded depositor? If the law establishes that the moneys deposited by Mitchell were held by Stewart in trust for him from the time of the deposits, and that a recognition of such trust by Stewart was unnecessary, and then presumes that the moneys drawn out in regular course of business by depositors and by Stewart came from the other funds in the bank, leaving Mitchell's untouched, then, of course, the money of Mitchell and the whole of it is considered as in the bank and now in the hands of the trustee in bankruptcy. But it seems to me that this is further than the courts have gone. In Matter of Holmes, 37 App. Div. 15, 18, 19, 55 N. Y. Supp. 708, 710, 711, affirmed 159 N. Y. 532, 53 N. E. 1126, the court said, quoting from Cavin v. Gleason, 105 N. Y. 256, 262, 11 N. E. 504, and McLeod v. Evans, 66 Wis. 401, 409, 28 N. W. 173, 214, 57 Am. Rep. 287:

"The true doctrine in that regard is stated in Matter of Cavin v. Gleason, 105 N. Y. 256, 262 [11 N. E. 504]: 'A court of equity in pursuing the inquiry and in administering relief is less hampered by technical difficulties than a court of law, and it may be sufficient, to entitle a party to equitable preference in the distribution of a fund in insolvency, that it appears that the fund or property of the insolvent remaining for distribution includes the proceeds of the trust estate, although it may be impossible to point out the precise thing in which the trust fund has been invested, or the precise time when the conversion took place.' And see Atkinson v. Rochester Printing Co., 114 N. Y. 168, 175 [21 N. E. 178].

"Within the case of Matter of Cavin v. Gleason, supra, the petitioners sufficiently establish the fact that the money which came into the hands of the administrators included the proceeds of the trust estate. It was not questioned but that he received of the trust estate $9,364.80 in 1890, and continued to pay the interest thereon to the petitioner up to the time of his decease, thus showing that the property he left on his decease included the trust funds in question. As suggested in the case cited, it was not necessary to show the precise thing in which the trust fund has been invested, or the precise time when the conversion took place. As said in McLeod v. Evans, 66 Wis. 401–409 [28 N. W. 173, 214, 57 Am. Rep. 287]: 'We do not understand that it is necessary to trace the trust fund into some specific property in order to enforce the trust. If it can be traced into the estate of the defaulting agent or trustee, this is sufficient.'"

But in Matter of Holmes, supra, the fund was a trust fund when it came into the hands of the depositor. It was never his money. In such cases the law imputes honesty, not dishonesty, to the holder of the fund, and presumes that whatever he has embraces the trust fund —that he has kept it or substituted other moneys. No such presumption, it seems to me, can be raised when the bank or banker procures the deposit by fraud or fraudulent concealment.

In Standard Oil Co. of Ky. v. Hawkins, supra, the case says:

"On the day when a national bank ceased business, and at a time when the officers of the bank knew it to be hopelessly insolvent, the complainant deposited in the bank certain funds, which afterwards came to the possession of the receiver of the bank appointed by the Comptroller of the Currency."

Here there was no question that the money deposited was in the bank when it closed its doors, or that it came to the hands of the receiver, although mingled with other funds.

In Frelinghuysen v. Nugent (C. C.) 36 Fed. 229, 239, Mr. Justice Bradley said, and this was quoted with approval in Peters v. Bain, 133 U. S. 670, 693, 10 Sup. Ct. 354, 361 (33 L. Ed. 696), as follows:

"Formerly," says Mr. Justice Bradley, "the equitable right of following misapplied money or other property into the hands of parties receiving it depended upon the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it, by exchange, purchase, or sale; but if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor."

In Smith v. Mottley, 150 Fed. 266, 80 C. C. A. 154, 17 Am. Bankr. Rep. 863, the note in question, or its proceeds, was appropriated by the bank but "a few days" before the bank made an assignment. It

then had three times the amount of the note on hand, and it was a fair presumption, in the absence of proof that the proceeds were on hand mingled with the general funds of the bank, all of which went to the trustee in bankruptcy. If Smith v. Mottley, supra, 150 Fed. 266, 80 C. C. A. 154, is good law in all it says, and it was decided without dissent by Lurton, now of the Supreme Court of the United States, Severens, and Richards, the petitioner here is entitled to be paid his entire claim. The court said:

"In the absence of any proof to the contrary, the reception of the funds being so near to the assignment by the bank, it may be presumed that the assets which came to the hands of the trustee were augmented by the appropriation of the proceeds of the check. If it were not so, the burden was on the trustee to prove it; or, if not augmented to the whole amount of the check, then to what amount they had been lost out. It is shown that three times the amount of this fund remained in the bank to the time of the assignment and came to the trustee. The burden of showing that his property has been wrongfully mingled in a mass of the property of the wrongdoer is upon the owner; but, when this is done, the burden shifts to the wrongdoer. It is for him to distinguish between his own property and that of the innocent party. Smith, Trustee, v. Township of Au Gres [150 Fed. 257, 80 C. C. A. 145, 9 L. R. A. (N. S.) 876], 17 Am. Bankr. Rep. 745; Hart v. Ten Eyck, 2 Johns. Ch. [N. Y.] 108; Starr v. Winegar, 3 Hun, 491; Stephenson v. Little, 10 Mich. 441, 450; Ryder v. Hathaway, 21 Pick. [Mass.] 298, 306; Seavey v. Dearborn, 19 N. H. 361; Robinson v. Holt, 39 N. H. 557 [75 Am. Dec. 233]; James v. Burnett, 20 N. J. Law, 635, 642; Kreuzer v. Cooney, 45 Md. 591; Elgin Bank v. Schween, 127 Ill. 580 [20 N. E. 681, 11 Am. St. Rep. 174]; Mayer v. Wilkins, 37 Fla. 244 [19 South. 632]; Weil v. Silverstone, 6 Bush [Ky.] 698; Stuart v. Phelps, 39 Iowa, 20; Loomis v. Green, 7 Me. 386; Dillingham v. Smith, 30 Me. 383; Lehman v. Kelley, 68 Ala. 192; Franklin v. Gumersall, 9 Mo. App. 90.

"Again, if the trustee takes the bankrupt's property in the same plight as the bankrupt held it, and while the bankrupt held the assets, they became subject to a lien upon the mass, which was not destroyed by its continual transformation in business from day to day, the paying out and receiving in, of parcels of the fund, and no creditor having levied upon it, or the right of an innocent party fastened upon it, it is difficult to see how by the succession of the trustee the lien could be lost. Whether it was a lien or not would continue to be the same question as it was between the bankrupt and the owner of the misappropriated fund."

I had supposed that the burden was on the claimant to prove his case and show by a fair preponderance of evidence that his money was commingled in the common mass of money on hand. If the evidence shows, as here, that in all probability the money has been paid out to other depositors, prior depositors, and that the money remaining is that put in the bank by subsequent depositors, how can it be said that the funds are traced and found commingled with other funds? To so hold is to impress all subsequent deposits with the trust relation and obligation created by law when Stewart obtained Mitchell's money by the fraudulent concealment, and hold that there has been a mere change of funds inasmuch as all subsequent deposits became the property of Stewart, and that it is immaterial that no substantial part of Mitchell's original deposits remained when the bank closed. The result of such a holding is to give a depositor of six months or a year ago, who was ignorant of the hopeless insolvency of a bank known to the bank, or to the banker in case of a private bank, a lien on the moneys subsequently deposited by others and remaining in the bank at the

time of failure, regardless of whether or not any of the money of such old depositor remains. If showing the deposit obtained by fraudulent concealment and the mingling of the funds with other deposits, and that there was always a balance greater than such deposits, although thousands of dollars were being deposited daily and other thousands drawn out, makes a case and throws the burden of proof on the trustee in bankruptcy to show that the moneys so deposited by the one asserting the fraud had been drawn out, it will be impossible to defend in the great majority of cases. While it is easy to show the money in, and that all deposits go into, a common mass from which payments are constantly being made in due course of business, it is impossible, with rare exceptions, to show what money was paid out.

In Board of Commissioners of Crawford County v. Strawn, 157 Fed. 49, 84 C. C. A. 553, 15 L. R. A. (N. S.) 1100, the same court that decided Smith v. Mottley, supra, per Lurton, C. J., explained the case, and what was really intended to be decided, as follows:

"Smith v. Mottley was this: Miss Smith owed a sum of money to Miss Wintersmith. When the note fell due, she paid into Mottley's bank the amount of the note, the bank claiming authority to collect the same, and that it would obtain the note and deliver it to her. Within 10 days the bank failed. The money so paid into the bank was placed upon the books of the bank to the credit of the payee. When Miss Wintersmith learned of the transaction, she repudiated the authority of the bank to collect her debt from Miss Smith. The latter filed her petition in the bankrupt court, and asked that her claim against Mottley's bank be paid in preference. From the time the bank wrongfully received Miss Smith's money until the time its doors were closed its general cash balance was never below the amount of Miss Smith's claim, and a sum of money in excess of her claim passed to the bankrupt's trustee. The court held that upon these facts the funds in the trustee's hands had been augmented to the full amount of this trust fund."

The court in the same case also said:

"Touching the necessity of either identifying the owner's property in the hands of the receiver or showing that the assets which had come into his hands had been definitely augmented by property into which it had gone, this court, speaking by Judge Taft, said: 'It may not be necessary to show earmarks upon the proceeds of the thing parted with to justify such a remedy; but it must at least appear that the funds in the hands of the receiver were increased or benefited by the proceeds, and the recovery is limited to the extent of this increase or benefit. In every case relied upon by counsel for appellant, recovery, if decreed, was based on the fact that the property in the hands of the assignee or receiver of the person or bank against whom the claim of fraud, right to rescind, and priority of distribution was made, included in its mass either the very thing parted with or its proceeds. Railroad Company v. Johnston, 133 U. S. 573, 10 Sup. Ct. 390, 33 L. Ed. 683; Armstrong v. Bank, 148 U. S. 50, 13 Sup. Ct. 533, 37 L. Ed. 363; Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537, 52 Am. Rep. 9. The exact question is discussed with satisfactory fullness in Bank v. Latimer (C. C.) 67 Fed. 27; and the necessity for the presence of the proceeds of the very thing obtained by fraud in the mass of assets to be distributed is clearly pointed out.'"

Judge Lurton also referred to their decision in Erie R. Co. v. Dial, 140 Fed. 689, 691, 72 C. C. A. 183, and stated that recovery must be limited to the fund or property, or its proceeds, that can be traced into the hands of the trustee or receiver. In short, that no lien can be impressed on the whole mass of money or property into which the trust money or property has gone. So far as it is shown that the

money or property remaining in the hands of the bankrupt or those of his trustee has been augmented or increased by the trust money or property a lien is impressed and recovery allowed. This is the rule recognized and enforced by the Circuit Court of Appeals, Second Circuit, in American Can Company v. Williams, as Receiver (decided March 7, 1910) 178 Fed. 420. In this case the court applies and states the rule:

"It is therefore a part of the rule applicable to following misappropriated moneys in a bank account that, if at any time during currency of the mingled account the drawings out had left a balance less than the trust money, the trust money must be regarded as dissipated except as to this balance; the sum subsequently added to the account from other sources not being attributed to the trust fund."

But here at no time after August 15, 1908, did the drawings out leave a balance less than the deposits of Mitchell. Hence, if a trust attached to his deposits, and there is the presumption that other moneys were drawn, in preference to Mitchell, his are to be considered as remaining. Again, the Circuit Court of Appeals in the case last cited said:

"While the right to follow misapplied moneys as trust funds into the hands of a receiver has been extended in the modern decisions, there has never been in the federal courts a departure from the principle that there must be some identification of the property followed with the trust fund. Some of the latest cases say that it is sufficient to show that the property in the possession of the receiver has been increased or augmented by the trust funds. But that is only a different way of stating the earlier rule. It cannot be shown that property in the hands of a receiver has been increased by trust funds, unless it is shown that they were converted into or commingled with it. If the plaintiff's contention be well founded, and to follow misappropriated moneys it is only necessary to show that a receiver has, and that the trustee had, assets, the rule is simply that a demand for such moneys is a preferred claim against any substantial estate. To adopt this view is to do away with all the equitable principles out of which the right to follow trust funds grew."

There is no question that the deposits of Mitchell were commingled with the other deposits; the entire mass was money, or paper converted into money and then commingled, so that the balance referred to remained. This came to the hands of the trustee in bankruptcy. There can be no doubt that the Mitchell deposits not drawn out by him augmented or increased the balance in the bank at the time its doors were closed by the amount claimed—that is, the balance due him, $231.11—as there is no question that the Mitchell deposits went into the common mass. The balance would have been $256.56 only, had Mitchell not made the deposits referred to, or had he drawn out his entire deposits. If the Mitchell deposits had been trust moneys in his hands, there is no question he would be entitled to the balance due him, $231.11, under the decisions referred to. So if the deposits were impressed with a trust in favor of Mitchell at the time made, on account of the fraud, there is no question that he is entitled to the sum claimed.

In American Can Company v. Williams, supra, the Circuit Court of Appeals also cites Beard v. Independent Dist., etc., 88 Fed. 375, 379, 31 C. C. A. 562, 566, and quotes with approval as follows:

"The foundation of the right on the part of the owner of a trust fund to a preference over general creditors in payment out of a fund or estate that has

passed to the assignee or receiver of an insolvent person or corporation is that the trust fund has been wrongfully confused or intermingled with the property of the insolvent, or has been used to increase the value of property, thereby increasing the amount or value of the funds or estate passing into possession of the assignee or receiver; that, if this intermingling had not taken place, the fund passing to the receiver would have been so much less: that the creditors have only the right to subject the property of the debtor to the payment of their claims, and therefore the creditors cannot complain if the total fund coming into the hands of the receiver is reduced by the amount necessary to make good to the owner of the trust fund the sum which was wrongfully used in augmenting the fund or property passing to the receiver. Unless it appears that the fund or estate coming into possession of the receiver has been augmented or benefited by the wrongful use of the trust fund, no reason exists for giving the owner of the trust fund a preference over the general creditors."

The court, after these citations, concludes:

"The stipulation of facts failing to show that the misappropriated moneys, intact or converted into or commingled with other property, came into the hands of the receiver, the judgment * * * is affirmed."

The stipulated facts showed of the misappropriated funds "drafts paid by the drawees' checks on outside banks made payable to the Fredonia Bank and paid by the former to the latter before the appointment of the receiver." The defendant was receiver of said bank. The plaintiff sent the bank drafts for collection, and the bank collected them, but did not account for or pay over the money. It thus appears that the proceeds of this class of collections went into the possession of the bank before a receiver was appointed, but not that the proceeds were commingled with the funds on hand. As to the funds on hand the stipulation was:

"At all times mentioned in the complaint prior to the 20th day of June, 1905, the assets of the Fredonia National Bank and the assets which came into the defendant's hands as receiver, and which are now in his hands, exceeded the amount of plaintiff's claim."

Judge Noyes, in giving the opinion of the court, said:

"The difficulty is, upon the agreed statement of facts, in following such funds into the hands of the receiver. The stipulation of facts states merely that the 'assets' of the bank prior to the receivership, and which came into the receiver's hands, exceeded the amount of the plaintiff's claim. No basis whatever is furnished for tracing the misappropriated moneys into the hands of the receiver, or for holding that they were converted into, or commingled with, any other property or funds in his possession. It is not shown what the assets of the bank consisted of. It may be that the only assets which the receiver obtained were notes and bills receivable, or perhaps its banking house, which belonged to the bank before the transactions in question took place. It may be that prior to the receivership the bank used the trust funds to pay its debts with. It may be that these funds were wholly dissipated. There is absolutely nothing to show that they had any connection with any of the property which came into the possession of the receiver. The stipulation of facts is wholly insufficient to show any identity of the property followed with the funds sought to be charged against it or to show that the amount of such property was increased or augmented by such funds. Indeed, the negative is not shown. It does not appear that, if there had been no misappropriated moneys, the assets of the bank would have been less."

I think the opinion in this case shows the holding to be that, where a bank collects paper intrusted to it for collection and misappropriates

the money collected or fails to account for and pay same over, it is sufficient to show, in order to justify collection from the funds in the hands of the receiver when appointed, that the moneys so collected went into and were commingled with the moneys of the bank; that the balance of money on hand was thereafter never less than the amount so collected and misapplied even in cases where there were large deposits and withdrawals by others; and that the balance of the moneys so commingled went into the hands of the receiver; but that it is not sufficient to show that the "assets" of the bank were at all times greater than the amount misappropriated; and that such "assets" came to the hands of the receiver. In short, the trust attaches to and follows the commingled fund so long as any of it remains, but never attaches to the general assets, or to funds deposited after the commingled fund has been drawn out. But if the commingled fund is being constantly augmented by new deposits and drawn upon, and the fund is not reduced below the deposits in question, then it is assumed as matter of law that identity is established.

It seems to be assumed that "first in, first out," and that in such a case as this, as shown by the table, as there was always a balance greater than Mitchell's deposits, it is presumed his money was in the moneys on hand when the bank closed. I think this more a legal fiction than a matter of fact; but nevertheless I am bound to follow the doctrine and apply it here on the theory that, when Mitchell's money was obtained by the fraudulent concealment, it was impressed with a trust for his benefit which attached to the general fund with which his deposits were commingled, and that this trust followed that fund so long as it was never exhausted but remained greater than the amount of Mitchell's deposits and finally came to the hands of the trustee, even though it affirmatively appears that the fund may have been kept up by the deposit of thousands of dollars by other depositors who have not been paid and whose moneys were not drawn out by them. It appears here that within a month of the time Stewart closed his doors $2,195.61 was deposited by persons who did not draw it out. The evidence shows simply that it was deposited and not drawn out by the depositors. It does not appear that Stewart did not loan it or use it for his own purposes. It may have been paid to prior and subsequent depositors on checks, or it may have been loaned. This is equally true of the money deposited by Mitchell as to what might have occurred. A reference to the opinion of the Circuit Court of Appeals in Matter of A. O. Brown et al., 175 Fed. 769, 23 Am. Bankr. Rep. 423, 426, shows the extent to which that court expresses a willingness to go in declaring a trust as to moneys in a bank in favor of one whose property has been misappropriated and against the trustee in bankruptcy. I think I am bound to hold that there has been sufficient identification of the Mitchell deposits as a part of the fund on hand when the bank closed and that went to the trustee; that, it not affirmatively appearing that it was drawn out or paid out by any one, the balance was and is impressed with a trust in his favor; and that he is entitled to an order for the payment thereof by the trustee from such fund.

As to an allowance of costs and expenses to the claimant, this court has steadfastly refused to grant them against or payable out of the

estate of the bankrupt. Claimants having claims against the estates of bankrupts must establish them at their own expense. In all cases where there is a substantial question as to the right, it is the duty of the trustee to defend and compel proof. Any other rule will result in the dissipation of estates in bankruptcy in paying the costs and expenses and attorney's fees of claimants incurred in establishing their claims. What rule this court might adopt should a trustee unjustly or captiously defend a just claim it is not necessary to state. Inasmuch as the special master was appointed by the court to take the evidence and report for the information of the court, the amount paid him will be allowed and paid from the bankrupt estate.

There will be a decree with findings of fact and conclusions of law accordingly.