## 38

Joseph W. Hungerford
vs.
Rennselaer L. Curtis, Receiver, et al. } Eq.No.3610

DECISION

December 13, 1917

BARROWS, J. Heard on bill, answer, replication and issues of fact.

Since bringing the bill, complainant has died and his executor has taken up the action. The respondents are Rennselaer L. Curtis, Receiver of the Atlantic National Bank; James H. Morton, discount clerk in the Atlantic National Bank since 1906; Ella Morton, his wife, and the National Exchange Bank. The interests of the va-

rious respondents will appear in the course of the decision.

The bill specifically seeks to establish a trust. It alleges that a certain cashier's check on the Atlantic National Bank for $7800, dated April 10, 1913, represented funds belonging to the complainant. The testimony showed that on Hungerford's order on August 1, 1906, there was drawn from a bank and turned over to the respondent, James H. Morton, for investment, the sum of $10,438. On July 30, 1906, Morton had written Hungerford that he would deposit the money in the Atlantic National Bank to be used "as we find investments that pay better than 4 per cent." (Complainant's Exhibit 10). Without the knowledge or consent of Hungerford, Morton deposited this sum, with something over $5000 additional, in the Atlantic National Bank in Morton's individual checking account. There is no evidence that this $5000 additional belonged to anyone other than Morton. The bank neither then nor at any later time had knowledge of the wrongful commingling by Morton of his own and trust funds. Neither had respondent Curtis any such knowledge until just prior to the bringing of this bill. There is no evidence whether the bank ever gave Morton any credit on the strength of this deposit. It does appear, however, that Morton had a line of credit with the bank amounting to between $80,000 and $100,000 at times and Morton himself says that the deposit was made in his name in order to gain prestige.

From August 1, 1906, until November, 1911, Morton made deposits and withdrawals on the aforesaid checking account. At one point in his testimony he said that Hungerford's funds had been in and out of his private account several times. At the end of August, 1906, the books show that the balance in Morton's favor

stood at $733.50. There is no evidence to show what had been done with the money withdrawn. During the years from 1906 to 1913, Morton made investments for Hungerford and sent to him annually or semi-annually a statement showing his dealings. He charged himself in most of these accounts with an item reading "J. H. M. funds $10,000." On Nov. 27, 1911, the balance in Morton's checking account was $75.99. On this date Morton secured a cashier's check No. 6811 from the Atlantic National Bank for $11,000 payable to his own order. Where this money came from is not shown. It is certain that it did not come out of Morton's checking account. Morton says that at this time he thought he would get Hungerford's affairs straightened out because Hungerford was an old man, over 80 years of age, and that he accordingly procured the check in question putting about $900 of his own money with $10,100 of Hungerford's money. There is absolutely no evidence that this $10,100 was made up of any funds of Hungerford's or was traceable in any way from Hungerford's securities. Morton in his testimony termed the check Hungerford's funds. It is apparent that Morton meant to have us understand that he was replacing the amount which he had wrongfully drawn from trust funds. Little credence, however, can be placed in Morton's testimony. He was familiar with bank practices. He admitted that he knew in 1906 the impropriety of mingling his funds with Hungerford's. We have doubts about his honest intentions of restitution to Hungerford in November, 1911, when he procured the check above referred to. His subsequent action in making personal use of several thousand dollars from this account either discredits any such intention or shows that his honest resolution was short-lived. He was palpably testifying falsely in relation to

Column A of Respondents' Exhibit A. In cross-examination his manner as well as the matter of his testimony showed this. Though he denied Curtis's statement relating to the reason for his discharge by the receiver, we have no doubt that he was discharged by Curtis for being faithless to his employer and revealing his bank secrets to Metcalf. His conception of honesty is well shown in the fact that the answer of his wife in this case prepared at his instance without any knowledge of facts on her part and that at his request she blindly swore to it. It is further shown by his statement to Curtis that the cashier's check now in litigation was as much his as his wife's a half-truth which he justified by saying that the check belonged to neither because it represented Hungerford's money and that the ownership thereof was none of Curtis's business. He swore to the proof of claim as his wife's alone. (Complainant's Exhibit 2). In her deposition she states that she never had any claim against the Atlantic National Bank. The reason Morton gave Curtis for making oath to the proof of claim on behalf of his wife, namely, the latter's illness, was another example of a half-truth equivalent to a falsehood. The real reason was that his wife's name was being used without her knowledge. If the truth had been that this $7800 check honestly was regarded by Morton as representing Hungerford's replaced money, we cannot believe that Morton, with the knowledge that he was then in debt to the bank to the extent of $10,000, which he was unable to pay, would have failed to state that no part of said check belonged to him. He testified that he placed the money in his wife's name in order to safeguard it, but we are satisfied on the evidence that Morton had not the slightest intention of asserting that the present funds in controversy were the property of Hungerford until it became apparent that he neither personally nor through his wife as a dummy could collect the money for himself. At this point it may be proper to add that the wife, Ella Morton, from her deposition, appears to be an honest, confiding woman, totally and unquestioningly submissive to her husband and willing to sign anything which he desires, or to ratify anything which he has done in her name. She makes no claim whatever to the check. Her ownership of the same may be totally dismissed and the question before the Court may be handled as if the check had stood in Morton's own name.

Check No. 6811 was returned to the Atlantic National Bank on December 28, 1911, and a new check No. 6928 for $10,500 was issued to Morton. On May 14, 1912, another transaction took place and check No. 7642 for $11,667.28 was issued to Ella Morton. On July 2, 1912, another exchange occurred and checks No. 7927 and No. 7928 for $10,000 and $1,000, respectively, were issued to Ella Morton and James H. Morton, and a cash balance was paid to Morton. On November 30, 1912, check No. 7927 was exchanged for check No. 8773 to Ella Morton for $10,000 and cash interest was paid to Morton. On March 1, 1913, another exchange was made and check No. 9301 for $10,000 was issued to Ella Morton and Morton received cash interest. On March 26, 1913, another exchange took place and check No. 9453 for $9,000 was issued to Ella Morton and two checks No. 9455 and No. 9456 for $300 and $700, respectively, were issued to Morton. On April 10, 1913, another exchange brought check No. 9610 for $1,000 to Morton, No. 9611 for $200 to Morton, and No. 9612 for $7,800 to Ella Morton. The latter check was outstanding when the bank failed. It is this check which complainant

claims represented his funds. Upon the several checks the bank paid Morton interest as long as they were outstanding. This was a most unusual proceeding. We believe that Morton's reason for carrying the account in this form was to prevent his creditors from reaching his funds. The bank closed its doors on April 14, 1913, and a receiver was appointed April 16. The claim on check No. 9612 for $7,800 was sworn to as belonging to Ella Morton, invalid, by Morton acting as her agent. The first dividend, amounting to $1950 was paid by the receiver by check to the order of Ella Morton in June, 1913, and endorsed by her and deposited by Morton in the National Exchange Bank, together with $50; the source of which is not shown.

At the time of the payment of the second dividend in September, the receiver Curtis, who 'had been investigating the bank's claim of more than $10,000 against Morton for money advanced, became suspicious that the check proven for $7800 was not entirely the claim of Ella Morton and that the bank might have a lien upon this claim for Morton's indebtedness. He told Morton that at the time the claim had been proven Morton had said that the claim was as much his as his wife's anyway and Curtis declared that he was going to keep future dividends against Morton's indebtedness. Morton stated that it was too bad not to get interest and proposed that Mrs. Morton should endorse the check and that it should be placed in the National Exchange Bank where the first dividend had been deposited. To this arrangement Curtis said he saw no objection if the bank's lien was protected, and Morton thereupon gave to Curtis the book on the National Exchange Bank to keep as an evidence of good faith. Since that time the various dividends have been paid, endorsed by Ella Morton, and deposited in the National

Exchange Bank, and the book has been held by Curtis. It was claimed at the hearing that the book had been delivered to Curtis pursuant to a promise made by Curtis to give Morton time; that Curtis had agreed not to bring suit against Morton until January, 1914, and that in consideration of this promise Morton had agreed to deliver the book to Curtis. This claim we do not believe is substantiated by the testimony. It is denied by Morton—a matter of small moment—but it is disproved, it seems to us, by Curtis' letter to the Comptroller (Complainant's Exhibit 42 25.) Curtis was a lawyer and this letter was entirely inconsistent with the claim that he received the book in consideration of a promise not to bring suit. He himself call it a "sort of collateral security." The theory of present consideration in the giving of time is clearly an afterthought. We are satisfied that Morton turned over the book because Curtis threatened to assert a lien and declined to pay him further dividends if he did not do so, and that Curtis only expected to hold the book either under his lien or as a sort of moral suasion to compel the carrying out of Morton's promise to settle his indebtedness to the bank. Morton was in a position where, having admitted his unfaithfulness to Curtis and playing a false role as he was attempting to do with this money, he deemed it the part of prudence to let Curtis hold the book without further dispute. We are not justified in finding that Curtis occupies the position of a bona fide purchaser for the value of the chose in action either against the National Exchange Bank or the Atlantic National Bank. The question comes back to the relative rights of Hungerford and Morton, or the latter's general creditors, for while it nowhere flatly appears that Morton is insolv-

ent, it does appear that he has been called in on supplementary proceedings based upon a judgment for $10,712 in this court, and that he still owes this sum. Counsel not improperly have treated this case as if Morton was financially irresponsible.

Morton occupied a fiduciary relation to Hungerford as his investment agent, hence when in 1906 he made a deposit of $15,551.22 in his own name in the Atlantic National Bank, said deposit was impressed with a trust to the extent of Hungerford's share, amounting to $10,438. (In re Hallett, 13 Chan. Div. 696, 1876. Slater Trust Co. vs. Oriental Mills, 18 R. I. 352.) In accordance with the rule everywhere now accepted, withdrawals from said account were presumed to be from Morton's private funds until the balance had been reduced below $10,438. When said balance had been so reduced in 1911 to $75.99, or entirely wiped out, if at any time this did occur, the trust fund had clearly been dissipated to that extent and had ceased to be traceable, because there is no evidence to show what Morton did with his withdrawals. Watson vs. Thompson, 12 R. I. 466, at 471 (1879), indicates that our Court would have then held that the trust could only apply to the smallest balance at any time remaining in the trust fund; that the relations had been changed to debtor and creditor. Such has without doubt been the weight of authority up to this time. Had there been no other deposit in the Atlantic National Bank, therefore, $75.99 would have been the limit of Hungerford's claim to this deposit as a trust fund. There was no other deposit in this particular account and on the bank's failure, this balance had disappeared.

At this point we are met with the question whether we can treat the payment of $11,000 to the bank on November 27, 1911, in exchange for the cashier's check as a new deposit in the trust account. Interest was paid on this check and others given in substitution therefor. The check constitutes a chose in action against the bank just as did the balance of $75.99 in Morton's checking account. It was handled like a deposit and it seems to us that the mere form in which the bank's obligation was given does not alter the principle that both were choses in action aainst the bank and that the deposit with which the cashier's check was purchased should be treated as if it had been put in Morton's checking account. (Re Hallett, supra, page 734-5). This check No. 6811 of November 27, 1911, is directly traceable to the $7800 check now involved, and we have the question presented whether a deposit of the trustee's own money without an honest intention to replace the trust funds operates to increase the depleted trust fund so that the cestui as against the trustee or his general creditors can claim all of the fund up to the amount originally contributed from the cestui's money. There is no authority on this question in Rhode Island.

The general question of the tracing of misappropriated trust funds is carefully treated in an article by Dean Ames in 1906 in 19 Harvard Law Review, 511, referring specifically to a new deposit at page 519; in an article by Prof. Scott in 27 Harvard Law Review, 125 (1913); in a note to a case in 16 L. R. A. (N. S.) 1100, and in Perry on Trusts, 6th ed. Vol. 2, page 1359, Sec. 828. The great weight of authority is against giving the cestui a preference over general creditors merely because of misappropriation.

That the cestui's rights are confined to the lowest amount at any time on deposit in the commingled fund is flatly held in some cases and new deposits do not improve his condition.

Mercantile Co. vs. St. Louis Co., 99 Fed. 485 (1900).

Re Mulligan, 116 Fed. 715 1st Circuit (1902).

Re Youngs, 5 Dem. Sur. 141 (1887).

Covey vs. Cameron, 104 Ark. 550 (1912).

ŤŤ
Cole vs. Cole, 54 N. Y. A. D. 37 (1900) competing cestuis.

On the other hand some courts have found it inequitable to deny the cestui's rights against the trustee or the latter's general creditors, and have held that it must be presumed in making the new deposit, where the sources of such deposit were not shown, that the trustee's intention was to be honest and replace the trust fund with his own money. They have given the cestui an equitable lien on the deposit.

United Nat. Bank of Troy vs. Wetherly, 70 N. Y. A. D. 279 (1902).

Re McIntyre, 181 Fed. 960 (1910).

Baker vs. N. Y. Nat. Ex. Bank 100 N. Y. 31 (1885).

Re Stewart, 178 Fed. 463.

Gorman vs. Littlefield, 229 U. S. 19 (1913) stock certificates.

Jeffrey vs. Tower, 63 N. J. Eq. 530 (1902).

These cases clearly cannot be justified on the doctrine of tracing specific trust funds. They must rest on some doctrine of unjust enrichment to the general creditors or of estoppel against the trustee. If the trustee is solvent there is no need of such a doctrine; if insolvent, we do not see the equity of taking funds from the general creditors to atone for the taking of the cestui's funds. In the case at bar Morton had a line of credit at the bank of many thousand of dollars. Why should we presume that the money for check No. 6811 was Hungerford's money rather than the fruits of Morton's borrowing

from the bank Why presume that the trust funds have augmented Morton's general assets when he was dealing, as the evidence shows, in all sorts of unsafe business ventures with any money which he could get hold of? We find difficulty in presuming that a trustee making new deposits is honestly intending to replace trust funds, when, as here, we believe the evidence shows otherwise. We find it hard to discover an honest intention to preserve the trust funds when the trustee turned over the claim thereto to a general creditor as an evidence of good faith. The view urged by the receiver that the complainant has seen fit to rest his case on the tracing of trust funds and must either stand or fall by that seems to us too narrow. If complainant's case can be rested on a broader equity, such as unjust enrichment of the trustee or the latter's general creditors, on his prayer for general relief we think he would be entitled to the aid of this Court. While some of the authorities seem to be tending in the latter direction, the view is not one that we feel like adopting, and we therefore hold that the complainant is not entitled to the property in question or to a lien thereon.

### 45

The answer of receiver Curtis asks for affirmative relief in the form of a lien upon said funds in the hands of the National Exchange Bank and upon the claim of said Ella Morton against the Atlantic National Bank and upon the dividends in liquidation arising therefrom.

We cannot sustain this contention on the basis of a lien on the first dividend voluntarily paid by the Atlantic National Bank to the order of Ella Morton and deposited in the National Exchange Bank. The receiver did have a lien on funds in the Atlantic National Bank in the name of Morton or his wife at the time of the

bank's failure. This depended on the money remaining in the bank's possession.

Morse, Banks & Banking, 5th ed., Sec. 324.

This lien was good even against a trust fund not known to be such by the bank.

5 Cyc. 552.

School District of Greenfield vs. First Nat. Bank of Greenfield, 102 Mass. 174.

After a portion of this deposit had been paid out, however, the lien no longer attached to the portion so paid. There is, however, a question whether this first dividend payment was procured by false representations by Morton which constituted a fraud. If such can be found, the $1950 paid as a first dividend being still capable of identification in the hands of the National Exchange Bank, it is conceivable that the same might be considered as a trust fund which the receiver would be entitled to follow and claim. The testimony does not warrant us in reaching this decision. At the time Ella Morton's claim against the Atlantic National Bank was proven, Morton told Curtis that the money for which the claim was made belonged as much to him as to his wife. In spite of the fact that Morton swore that the claim belonged to his wife alone, Curtis, it seems to us, was put upon his inquiry as to Morton's interest in this deposit. He is chargeable with knowledge that his lien depended upon retaining possession of the fund. He very naturally inferred from Morton's statement that some portion of the deposit was Morton's. Morton made no statement, however, as to what portion was his and Curtis asked no question about it. Under such circumstances it seems to us improper to hold that Curtis was misled by Morton's false statement into making the first dividend payment to Ella Morton. He made the payment evidently taking a chance that the fund belonged equally to both of them and that the balance, after the first dividend was paid, would cover the bank's lien on one-half of the deposit. As to the first dividend of $1950, therefore, we find that Curtis has neither a lien nor can he follow the dividend as trust funds.

All dividends subsequent to the first were paid without prejudice to Curtis' rights to a lien on the deposit and upon these we find that the bank had a valid lien, and that they are held by the National Exchange Bank for the benefit of Curtis as receiver of the Atlantic National Bank. By the same reasoning, the receiver is entitled to a lien on the unpaid balance of the claim of Ella Morton against the Atlantic National Bank.

A decree may be entered in accordance with this decision.

For complainant: S. H. Davis.

For respondents: Mumford, Huddy & Emerson, Waterman & Greenlaw.