## COVEY *v.* CANNON.

### Opinion delivered July 8, 1912.

1. BANKS AND BANKING—GENERAL AND SPECIAL DEPOSITS.—Where money is placed in a bank in the usual way, the relation of debtor and creditor is established, and the bank is authorized to mix it with its funds and use it in its business; but where money is placed in a bank for safe-keeping and not to be checked out, or under an agreement that the

bank should act as bailee or agent and deliver the money to some other persons under certain conditions or apply it to a special purpose, it is a special deposit, and the bank is an agent or bailee with no right to mingle it with its own funds. (Page 558.)

2. SAME—SPECIAL DEPOSIT—MINGLING OF FUNDS.—Where checks, given as part of the purchase price of lands, and either made payable to a certain bank or indorsed to it, were delivered to the bank to be held until the sales were completed, with no intention that the checks should be cashed and the money deposited to the credit of the drawers, the deposits were special, and the relation of debtor and creditor was not established, though the bank cashed the checks and mingled the proceeds with its funds. (Page 558.)

3. SAME—INSOLVENT BANK—PREFERENCE.—The mere fact that an insolvent bank owes one for trust funds does not entitle him to a pref- erence as against the receiver of the bank, but he must show that the receiver has in his hands some of the trust funds, or property purchased with such funds, or property into which the funds have been invested. (Page 559.)

4. SAME—INSOLVENCY—FOLLOWING TRUST FUNDS.—Where a bank has mingled trust money with its own funds, money paid from such fund for its own purposes will be presumed to have been paid from its own money and not from the trust funds; but where the mingled fund is at any time reduced below the amount of the trust fund, the latter must be regarded to that extent as dissipated, and sums subsequently added from other sources can not be treated as part of the trust fund. (Page 560.)

5. SAME—INSOLVENCY—FOLLOWING TRUST FUNDS.—Where, at the time an insolvent bank paid another bank a sum to cover a protested draft, there remained a sum larger than the lowest sum to which the bank's cash had been reduced after the mingling of trust funds deposited therein with the funds of the bank, the balance above that necessary to cover the draft, which was returned to the receiver of the insolvent bank, could not be regarded as part of the trust funds. (Page 561.)

6. SAME—INSOLVENCY—FOLLOWING TRUST FUNDS.—Where notes given for the purchase money of land were placed in escrow in a bank without the knowledge of their owner, and the notes were subsequently sold by the receiver of the bank, the owner of such notes was entitled to the proceeds of such notes as against the general creditors of the bank. (Page 562.)

Appeal from Benton Chancery Court; *T. H. Humphreys,* Chancellor; reversed in part.

### STATEMENT BY THE COURT.

This suit is by appellees to charge certain funds in the hands of the receiver of the Bank of Siloam with a

trust and to have same applied to the payment of their claims in preference to the claims of general creditors; and from the decree directing it done the receiver appealed.

The Bank of Siloam closed its doors August 6, 1910, and a receiver was on that day appointed.

On February 4, 1909, Ollie Stout, as guardian, loaned the bank $9,000, taking its notes, bearing 8 per cent. interest, payable annually, due five years after date. The bank executed to her a written contract agreeing to assign to her, as collateral, good notes secured by real estate mortgages in the aggregate $9,000 to be placed in her private box in said bank, as a special deposit, each party having a key to same. The bank had the right to collect the interest and principal of the collateral notes as they became due and to release the mortgages, upon condition that it should at the same time replace the notes so collected with notes of equal amount assigned and secured in a similar way and bearing the same rate of interest, keeping the amount of collateral in the box equal to the amount due the guardian on the notes until they should be paid.

The bank assigned and deposited in the box 10 per cent. notes properly secured, and continued to keep the collateral equal to the amount due on its notes to July 7, 1910, and on that date, without her knowledge or consent, it took from the box a collateral note and mortgage for $900 on which the principal and interest was not due until January 1, 1911; collected the same in full and released the mortgage and appropriated the amount so collected and mingled it with the funds of the bank, making no entry of the transaction on the books of the bank, nor placing any amount to her credit as guardian, nor did it replace in the safety deposit box any money or security as collateral in the place thereof, leaving the amount of collateral less than the amount due on its notes to her in the sum of $834. She had no knowledge of this transaction until after the bank closed.

Jerome Mason, of Lincoln, Kansas, purchased of Wm. Cook, of Everett, Kansas, through his agent, C. E. Sheldon, on March 30, 1910, certain lands in Washington County, Arkansas, agreeing to pay therefor $2,700, $500 of that date to be paid to the real estate brokers of Siloam Springs to be

deposited with the contract of purchase and the deed in the Bank of Siloam when the contract was returned executed, $1,000 to be paid on or before December 1, 1909, $1,200 on or before April 1, 1911, deferred payments to be secured by mortgages on the land. The agreement, deeds, cash payment, notes, mortgages and all other papers by the Bank of Siloam subject to the terms and conditions named in the agreement; when the deeds are deposited and abstract approved, the $500 cash payment to be placed to credit of Sheldon; and when the $1,000 note is paid, exchange of papers to be made. P. E. Moss, of the firm of real estate brokers, transacted the business with the bank, and on March 28, 1910, when the terms of the contract had been agreed upon, received from Mason his personal check on a bank of Lincoln, Kansas, payable to his firm, for $500 to cover the cash payment. After the contract was executed and returned, this check was indorsed to the Bank of Siloam by Moss and placed with the contract in one of the firm envelopes, unsealed and indorsed thereon: "Deposited in the Bank of Siloam, Apr. 11, 1910, C. E. Sheldon, Agent, to Jerome Mason. Sale of 164 acres of land in Washington County, Arkansas. Sold for $2,700. $500 cash, $1,000 on or before Dec. 1, 1909, $1,200 on or before Apr. 1, 1911. No money to be paid to C. E. Sheldon, Agt., until abstract of title is approved. Sale by Moss Bros., Hays & Ballou. Contents—Contract—Check for $500, to be collected and held in escrow. Moss Bros., Hays & Ballou."

This envelope, with the contents, was delivered to the bank on April 11, 1910, and the cashier instructed to hold the same in escrow as provided for in the contract. The bank issued duplicate receipts, in substance the same as the indorsement on the envelope, and, without the consent of Moss, Sheldon or Mason, placed the amount of the check on its ledger to the credit of Jerome Mason, marked the account "escrow," collected the check, and mingled it with the funds of the bank. Neither Mason nor Sheldon kept any account with the bank, nor did they have any knowledge of this transaction, and the abstract of title had not been approved before the bank failed, but it was afterwards approved, and the sale consummated, with the exception of the payment of the said $500.

Patrick Cannon purchased a piece of land in Washington

County June 16, 1910, from Nancy Smith, through said P. E. Moss, a real estate broker, under like terms and conditions as the Sheldon-Mason transaction already set out, except that one of the deferred payments was due July 1, 1910, and Cannon made his personal check for the first payment on a bank in Kansas, payable to the Bank of Siloam, so that the brokers did not have to indorse it. The contract provided that for the failure for ten days to make any deferred payment the deed was to be returned to the grantor. The contract, deed and check, indorsed as in the other case, were delivered to the bank on June 17, 1910, and the bank placed the $500 on its ledger to the credit of Patrick Cannon, marked the account "escrow," collected the check, and mixed the funds with its own funds. Upon the next payment being due and the abstract of title not being approved, Cannon purchased of the bank in Lincoln, Kansas, a draft for $500 payable to the Bank of Siloam, and sent it to the bank with the following letter:

"Lincoln, Kansas, June 29, 1910.

"Bank of Siloam, Siloam Springs, Arkansas:

"Gentlemen: Inclosed please find draft No. 83,084 for $500, acct. Pat Cannon, for payment of land purchased of Nancy C. Smith, widow, through P. E. Moss, of your city, and the contract for which land is on deposit in your bank. You are instructed not to turn this money to Mrs. Smith or any other person until requested by Mr. Pat Cannon, or his authorized agent, J. J. McCurdy. Under the terms of the contract, the abstract of title was to be submitted for examination, and this has not been done, and in the event abstract is not submitted for examination within a reasonable time the inclosed amount is subject to recall by Mr. Cannon. Hold the money until instructed to do otherwise by Mr. Pat Cannon.

Respectfully yours,

"J. A. Shillinger, Cashier."

The bank credited this check as it had done the others, collected the money, and put it with its own funds, of which the other party had no knowledge until after the bank failed. The trade was afterwards closed, with the exception of the payment of the $1,000 that had been appropriated by the bank.

Darby, a nonresident, owned ten acres of land near Siloam Springs, which was mortgaged to Harris for $414.20. Brockman, as agent, contracted to sell the land to Stillions for $850. Stillions had $300, and he and said agent placed it in escrow in said Bank of Siloam on July 14, 1910, with a contract allowing Brockman thirty days in which to procure a loan for Stillions of $550, the balance of the purchase money, and, in case of his failure to do so, the contract was to be cancelled, and the $300 to be returned to him. The bank, without the knowledge or consent of Darby, placed the $300 to his credit on its books, marked the account "escrow," and mingled the money with its own funds. On August 3, 1910, the cashier informed said parties that the bank would loan the $550. On August 5, 1910, Stillions and his wife executed to the bank two promissory notes for $275 each, due in one and two years, with interest, secured by mortgage on the land. The bank placed another credit of $550 to the account of Darby on its ledger, charged his account with the $414.20 due Harris on his mortgage, placed that amount to Harris's credit, and took a release of the mortgage from him. It charged also the account of Darby with $42.50 due Brockman for commission, and placed that sum to Brockman's credit. Neither Darby nor Brockman was present at these transactions, and did not authorize the bank to place the $550 to the credit of Darby, and had no knowledge of the business transacted by the bank at that time until after the bank failed on August 6, 1910. Neither of them ever authorized the bank to place any of the money collected for Darby to his credit in the bank. The two notes and mortgage executed to the bank by Stillions came into the hands of the receiver, and were sold by him for $550, cash, by order of the chancery court. Darby prayed that the receiver be ordered to pay him the sum of $850, the sum for which the land was sold, less the amount paid on the Harris mortgage.

The interveners alleged that the bank wrongfully mingled their said moneys with its own funds, and that such funds came into the hands of the receiver, either in cash or in securities.

The bank at the time of the Sheldon-Mason transaction was insolvent, but had on hand other sums in cash and various securities and other assets, and continued to carry on business

until August 6, 1910, at no time reducing the amount of actual cash on hand to a less sum than $1,500 until the morning of that day. On that morning the cashier of the State Bank of Siloam Springs received from it $1,074.42, to protect said bank on drafts given it by the Bank of Siloam, which had been protested. "Laffollette, its cashier, kept said amount intact in his bank for the purpose for which it was given, paid out of it the amount of all protested drafts, which left a surplus of $526, for which amount he gave appellant as receiver exchange on the 12th day of August, 1910, which exchange the receiver collected in cash."

On the same morning the cashier of the Farmers' National Bank received from the failed bank $1,331 to pay a protested draft and $957.04 in cash, for deposit in said bank, which was supposed at the time to be all of the cash remaining in the said Bank of Siloam, and, being in small change, was not counted and credited until August 10, 1910. The bank, after taking out these amounts, closed its doors, and on August 10, when the receiver took charge, there was only $13 in pennies in the Bank of Siloam. On August 12 he collected of the Farmers' National Bank $957.04 which had been deposited therein, as stated, which, with the $13 in pennies, and the $526 collected from the State Bank of Siloam, amounted to $1,496.04, which it was alleged was the lowest amount to which the cash in the Bank of Siloam had been reduced since the first of April, 1911, when the Mason check for $500 was placed therein.

Other moneys and securities came into the hands of the receiver, not more than sufficient to pay fifteen or twenty cents on the dollar to general creditors.

The court found that the bank had no authority to place the $500 collected on the Mason check and the $1,000 collected on the Cannon draft and check to the credit of Mason and Cannon, nor to place the amount collected for the Darby land to his credit, and was without authority in either of the cases to mingle the moneys so collected with the funds of the bank; that it was not a general deposit, but a trust fund, to which the owners became entitled to an equal amount of the bank's money, with which it was mingled, and that any money thereafter paid out by the bank was presumed to have been the bank's own money; and, so long as the payments did not reduce

the amount below the amount of $1,496, belonging to them, they had the right to their *pro rata* part thereof out of said sum of money in preference to the general creditors.

In the Stout claim it was held that the bank was without authority to collect the $900 collateral note before it was due, and to convert the money to its own use or to mingle it with its own funds, except after replacing the security with another of like amount under the instructions of the contract; that, since it failed to do this, the money collected remained the property of Ollie Stout, guardian, and her right was not affected by the wrongful mingling of the funds of the bank with it, except as in the Mason and Cannon cases.

In the Darby claim, it held that the transaction was in effect as if the bank had held the $300 first deposited and afterwards received another $550 for him and immediately paid out of the total of $850 for him the $414.20 due Harris, the $42.50 due Brockman, and invested the balance of $393.30 of his money, together with $156.70 of its own money, in the two notes of Stillions for $275 each.

It was held that each of the other interveners had a prior lien to the general creditors on the said $1,496.04, composed of the amounts received by the receiver, as already stated, which the court held remained in the bank on August 6, 1910, when its doors were closed.

*E. P. Watson* and *Rice & Dickson*, for appellant.

1. The deposit was a general one, and the bank became the owner of the money. 3 A. & E. Enc. (2 ed.) 819, note 3; 36 Am St. 157; 42 *Id.* 285; 15 *Id.* 515; 41 *Id.* 795.

2. The finding that $1,496 in money was on hand in possession of the bank is erroneous.

3. The money belonged to the bank and all its creditors alike, and not to the interveners. After the bank's insolvency, the interveners had no lien, and were entitled to no preference. 33 Am. St. 141 Ill. 261; 30 Am. St. 585; 34 L. R. A. 532, 536; 43 S. W. 242; 52 Am. St. 802; 3 Am. & E. 819-20-21; 148 U. S. 50; 41 Am. St. 515; 39 Cyc. 528-548.

4. Where a trust fund has been so intermingled that it can not be traced or identified, and the trustee becomes insolvent, the *cestui que trust* has no claim or lien superior to

other creditors, but is simply a general creditor. Cases *supra*; 39 Cyc. 544, note 56; 83 Ark. 486.

5. Ollie Stout was not simply a depositor in the bank, but by the loan the relation of creditor and debtor was established, and she has no lien.

*McGill & Lindsey* and *D. C. Shannon*, for appellees.

1. The receiver was not a purchaser for value without notice, but took the property subject to all valid claims or liens, and property of others does not constitute a part of the assets. 98 Ark. 294; 148 Mo. 358; 71 Am. St. 608. The moneys received from Mason and Cannon were special deposits; the title remaining in the depositors. 69 Ark. 43; Zam. on Banks, § 130; 5 Cyc. 514, 515; 3 A. & E. Enc. 822; 5 S. D. 221; 49 Am. St. 869; 197 Ill. 104; 64 N. E. 292; 32 L. R. A. 479. The test is, was there an understanding that money when collected shall *not* be held as a special deposit? 114 N. C. 343; 41 Am. St. 795; 148 U. S. 50. If there is an express or implied agreement, or the circumstances show that proceeds when collected are not to be used and treated by the bank as a part of its general funds, the general rule does not apply. *Ib.*; 69 Tex. 489; 5 Am. St. 85; 61 Neb. 181; 52 L. R. A. 858; 3 A. & E. Enc. L. 822.

2. Where trust property has been mingled so that the identity is lost, equity creates a lien on the whole mass. 39 Cyc. 536-7; 26 Ore. 121; 47 Ark. 533; 33 *Id.* 621; 96 *Id.* 281; 32 Am. St. 125; 73 Ark. 324; 83 *Id.* 486; 17 Idaho 1; 64 Neb. 822; 57 L. R. A. 885; 39 Cyc. 539-543; 104 U. S. 54; 218 *Id.* 27, etc.; 73 Ark. 324; 83 *Id.* 486.

KIRBY, J., (after stating the facts). If the moneys of these claimants had been placed on deposit in the bank in the usual way, they would have been general deposits and established the relation of debtor and creditor between the bank and the depositors; the bank having the right to mix the moneys with its other funds and use it in its own business. Zane on Banks, § 130; *Steelman* v. *Atchley*, 98 Ark. 294; *Carroll County Bank* v. *Rhodes*, 69 Ark. 43. If it was placed in the bank for safekeeping, and not to be checked out by the depositor, or under an agreement that the bank should act as bailee or agent and deliver the money to some other persons under certain condi-

tions or apply it to a special purpose, it would have been a special deposit and the bank an agent or bailee with no right to use it and mingle it with its own funds. *Warren* v. *Nix*, 97 Ark. 374; Zane on Banks, § 130; 5 Cyc. 514, 515; 3 A. & E. 822; *Woodhouse* v. *Crandall*, 197 Ill. 104, 64 N. E. 292; *Kimmel* v. *Dickson*, 5 S. D. 221, 49 Am. St. Rep. 869; *Anderson* v. *Pacific Bank*, (Cal.) 32 L. R. A. 479.

As said in *Commercial National Bank* v. *Armstrong*, 148 U. S. 50: "All deposits made with bankers may be divided into two classes, namely, those on which the bank becomes bailee of the depositor, the title to the thing deposited remaining in the latter; and that other kind of deposits of money peculiar to banking business, in which the depositor, for his own convenience, parts with the title to his money and loans it to the banker; and the latter, in consideration of the loan of the money and the right to use it for his own profit, agrees to refund the same amount or any part thereof on demand."

It was not the purpose nor intention of Mason or Cannon, upon placing the checks and drafts with the contracts of purchase and the deeds to be held in the bank and delivered when the trades were consummated, that the checks should be cashed and the money deposited therein to their credit, and the bank did not understand that such was the purpose, as clearly shown by its marking the account "escrow" in each instance. This was all done without the knowledge of either of the parties, and doubtless for its own convenience to identify the fund. Said deposits, in any event, were not general, but special, deposits for a particular purpose. The funds were so placed to the credit of these individuals as depositors without right and authority, and wrongfully mingled with the funds of the bank. The ordinary relation of debtor and creditor was not thereby established, nor did the funds lose their character as trust funds by being so wrongfully used and commingled with the funds of the bank; but, as said in *Hill* v. *Miles*, 83 Ark. 488: "The mere fact that an insolvent bank owes one for trust funds does not entitle such creditor to a preference. To obtain a preference, he must show that the receiver or person having charge of the assets of the insolvent bank has in his hands some of the trust funds or property purchased by such funds or into

which such funds have been changed or invested." Citing cases.

It was formerly held that the blending of trust money with that of the trustee defeated the owner's title, upon the theory that there was no way to identify money, and it could not, therefore, be recovered *in specie,* but the better rule, and one that seems now well established, avoids that difficulty in the case of commingled or blended moneys in a bank account from which amounts have been drawn from time to time by the presumption that the sums drawn out were the moneys of the bank or trustee which it had the right to expend in its own business, and that the balance remaining included the trust fund, which the bank had no right to use. Of course, this presumption will not stand against evidence; and it is a part of the rule applicable to following misappropriated moneys into a bank account that if, at any time during the currency of the commingled account, the amounts drawn out leave a balance less than the amount of the trust funds the trust funds must be regarded as dissipated to that extent and except as to such balance, and the sums subsequently added to the account from other sources can not be attributed to the trust fund. *Powell v. Mo. & Ark. Land Mining Co.,* 99 Ark. 553; *Crawford County Bank* v. *Strawn,* 157 Fed. 49, 84 C. C. A. 553, 15 L. R. A. (N. S.) 1100.

So, in this case, such of the interveners as are entitled to a preference can look only to the amount of the funds remaining in the insolvent bank, of which theirs can be considered a part under said rule, and it is conceded that the lowest amount to which the cash in the bank has been reduced after the mingling of the trust funds with its own, and before it closed its doors on August 6 and the receiver took charge, was $1,500, and no greater sum can be identified as trust funds. On the morning of that day its cashier delivered to the State Bank of Siloam Springs $1,074.42 to protect said bank on drafts given to it by the Bank of Siloam which had gone to protest, of which amount $526 was afterwards returned to the receiver. On the same day the cashier of the Farmers' National Bank received from the failed bank $1,331 to cover a protested draft and $957.04 in cash for deposit in said bank, which was supposed at the time

to be all of the cash in said Bank of Siloam, and was, in fact, all but $13 in pennies.

These three last amounts constitute a larger sum than said conceded lowest balance, $1,500, and interveners, being without right to a preference claim out of a larger amount of funds in the hands of the receiver than said sum of $1,500, can have no such claim against any of the $1,074.42 delivered to the Bank of Siloam Springs, for there was still left remaining in the failed bank after such payment, the $1331, the $957.04 and the $13 in pennies, it being assumed that these latter amounts were paid out after the payment to the Bank of Siloam Springs, since they were supposed to comprise all the money in the failed bank.

The Farmers' National Bank used the $1,331 to pay the failed bank's protested draft, and was indebted to it in the sum of the deposit $957.04, which was collected by the receiver. This last amount with the $13 in pennies is all that came into the receiver's hands that can be identified as part of the trust funds, $970.04 in all. It can be said that the $957.04 collected by the receiver from said Bank of Siloam Springs is sufficiently identified, for that much trust money actually went into sait bank as a general deposit, making it liable therefor as a debt, and it is as clearly identified thereby as if the cashier of the failed bank had bought with said money a note of said bank, instead of making a deposit therein. The $526 overpaid to the State Bank of Siloam Springs of the $1,074.42 delivered to protect it against protested drafts of the failed bank, afterwards returned to the receiver, does not increase the sum in his hands that can be identified as trust funds to which interveners are entitled, for, as already said, the whole of said sum is presumed to have been the failed bank's money, and its collection could not augment the trust fund any more than would the collection of any other debt due the failed bank, and the chancellor erred in holding otherwise.

No contention is made here among interveners that any are not entitled to a preference; and, as the general creditors would not be affected if some are not, it is not necessary to decide the question. Said interveners, except Darby, are entitled to a preference over the general creditors to be paid *pro rata* out of said sum of $970.04, and an allowance of the

balance of their respective claims against the receiver as general creditors.

As to the claim of Darby, the decree is affirmed. There was no authority to sell his land except for cash, and it will be considered that the two notes executed by Stillions to the bank to procure the money to pay cash therefor were taken for the balance of the purchase money, no cash being in fact received or paid, and that Darby ratified the transaction of taking the notes, and they became his property, and, having been sold by the receiver, he is entitled, as a preference, to the amount of his claim out of the proceeds of the sale thereof, over the claims of general creditors.

As to the other interveners, the decree is reversed, and the cause remanded with directions to enter a decree in accordance with this opinion.