TREASURER OF PUERTO RICO, Plaintiff and Appellee, v. BANCO COMERCIAL DE PUERTO RICO, Defendant and Appellee; CIPRIANO MANRIQUE, Petitioner, Intervener, and Appellant.

No. 6168. Argued March 15, 1933.—Decided March 9, 1934.

*E. Rincón Plumey* for appellant. *F. Ochoteco* for the appellee receiver. *Benjamin J. Horton* (*Charles E. Winter* on the brief), *Attorney General,* and *R. Cordovés Arana, Assistant Attorney General,* for the Treasurer of Puerto Rico.

Mr. Justice Córdova Dávila delivered the opinion of the court.

Cipriano Manrique brought, in the District Court of San Juan, an action of debt against Eliseo Diez, and in order to secure the effectiveness of any judgment that might be rendered, he attached the sum of $4,500 which the said Eliseo Diez had deposited on October 3, 1931, in the Cayey Branch of the Banco Comercial de Puerto Rico, to the order of Andrés Roselló, who did not accept the deposit made in his favor. As the bank was under judicial administration at the time the attachment was levied, the receiver was notified and requested to retain in his custody the said sum so as to secure to the plaintiff the effectiveness of the judgment that he was trying to obtain.

At the time Eliseo Diez deposited that amount, he received a certificate of deposit from the Banco Comercial de Puerto Rico, which literally copied reads thus:

"Banco Comercial de Puerto Rico.—Cayey, P. R.—October 3, 1931.—$4,500.—No. 1816.—Eliseo Diez has deposited in this Bank Four Thousand Five Hundred Dollars to the order of Andrés Roselló, payable in ordinary currency, conditioned upon the return of this certificate duly endorsed.—G. J. Collazo, Auditor.—P. Fernández Colón, Assistant Manager.—No checks may be drawn against this certificate of deposit."

On April 15, 1932, the intervener herein filed a motion requesting that the District Court of San Juan order the receiver of the said bank to deliver the sum of $2,432.34 to the marshal of the court so that the marshal might retain the same under the attachment levied to secure the effectiveness of the judgment in the action brought by Cipriano Manrique against Eliseo Diez, said sum being a part of the amount evidenced by the said certificate.

Subsequently the intervener filed a supplemental motion, wherein he alleged that in execution of the judgment rendered in the case brought against Eliseo Diez as defendant, the certificate of deposit issued by the Banco Comercial de Puerto

Rico in favor of Andrés Roselló had been sold at public auction and awarded to the intervener. He again requested that the court by an order direct the receiver to pay forthwith the amount of the certificate of deposit.

The receiver of the Banco Comercial de Puerto Rico objected to the claim of the intervener, and alleged that a certificate of deposit did not constitute a preferential credit or trust fund, and that the motions of the intervener should be denied, as he was a mere common creditor.

The District Court of San Juan overruled the aforesaid motions and thereupon the intervener, Cipriano Manrique, took the present appeal. He urges that the court erred in unduly applying the banking laws of the United States; in disregarding our own laws; and in holding that the certificate of deposit did not constitute a *depositum* properly speaking, and that the certificate had no other scope than that of a simple promissory note which merely creates the relation of debtor and creditor. The appellant maintains that the decision of the lower court is contrary to section 33 of the Banking Law of Puerto Rico, to section 306 of the Code of Commerce, and to section 1667 and other related sections of the Civil Code.

According to our Civil Code, a *depositum* is constituted from the time a person receives a thing belonging to another with the obligation of preserving and returning it. The bailee is obliged to keep the thing, and, when required, to return it; and he cannot make use of the thing bailed without the express permission of the bailor. When the bailee has permission to make use of the thing bailed, the contract loses the character of a *depositum* and becomes a loan or a *commodatum*.

It is manifest that the *depositum* has a purpose, namely, the custody of the thing delivered and its return to the bailor. Manresa points out, citing Portier, that in order to distinguish this contract of *depositum* from all other real contracts it is necessary to ascertain first the purpose sought by the

contracting parties. No *depositum* exists when the main object has not been to deliver the custody and preservation of the thing bailed, but the contract arises where the principal object of the delivery is the custody of the thing delivered.

The learned Spanish commentator calls attention to the difference existing between the special characteristics of the contract of agency and the mere custody of things, which is the distinguishing mark of the *depositum,* and says that courts and text writers have at times confused said contracts. Experience, according to Manresa, shows many cases of confusion due to a failure to apply the rule pointed out by Portier.

Commenting on sections 1767 and 1768 of the Spanish Civil Code, equivalent to sections 1667 and 1668 of our Civil Code, 1930 ed., the said commentator says:

"As regards the effect of the bailor's consent to the use of the thing by the bailee, we have little to say to clarify the point; for as the Code provides that by virtue of such consent the contract loses the character of a *depositum,* and it becomes a *commodatum* or a loan, as the case may be, it seems that there is nothing to add, except to say that the first situation will arise when the *depositum* consists of non-consumable things; and the second, when consumable things are involved. Now, is not a deposit in a bank a *depositum* of consumable things, subject to weight, number, or measure? Is not such a *depositum* the delivery of money, not in a closed safe, but by hand and with no other condition than its counting? Hence, are these deposits affected by the provisions of section 1768, so as to become in legal contemplation contracts of loan (*mutum*)?" 11 Manresa, 662, 663.

Manresa points out that section 1768 is a literal copy of section 1671 of the Code Project of 1851, and he reproduces the commentary of García Goyena on this and the preceding section, as follows:

"Therefore, we discarded the *irregular* deposit; also the question of whether the deposit of consumable things made according to weight, number, or measure implies a permission to make use of them; whether in case of an *implied* or *express* permission it is necessary

to exercise the same in order that the *depositum* may become a loan; and similarly as to the difference existing between an *express* permission at the time of entering into the contract, and a subsequent *express* permission. In short, permission must be express, and in that case the contract is a loan when consumable things are involved and a *commodatum* when they are otherwise.''

Thus, according to García Goyena, in order that the deposit of consumable things may change its juridical nature and become a loan, the express consent of the depositor is necessary in order to make use of the thing deposited. It is to be observed that both contracts, the loan and the deposit of consumable things, known as irregular deposit, have in common their intrinsic nature, the transfer of title, and the return of an equivalent thing. Manresa so states, and based on the interpretation favored by García Goyena, he expresses regret that irregular deposits or deposits of consumable things were omitted from the code. The Spanish commentator accepts the transfer of title as an effect of the deposit of consumable things.

The Code of Commerce does not speak of express consent, but simply of consent (*asentimiento*). Section 227 of said code (1932 ed.) provides:

''Whenever, with the consent of the depositor, the depositary disposes of the articles on deposit either for himself or for his business, or for transactions intrusted to him by the former, the rights and obligations of the depositary and of the depositor shall cease, and the rules and provisions applicable to the commercial loans, commission, or contract which took the place of the deposit shall be observed.''

Section 228 of the said code (1932 ed.) provides that ''deposits made with banks and with corporations or individuals owning warehouses, shall be governed, in the first place, by the provisions of the bank and warehouse laws, respectively; secondly, by the provisions of this Code; and lastly, by such rules of the common law as may be applicable to deposits in general.''

In considering together the provisions of the Civil Code that deal with express consent and those of the Code of Commerce that simply speak of consent (*asentimiento*), there comes to mind the question raised by Manresa with regard to the deposits of currency in a banking institution. It is well known that money delivered to a bank, when the delivery does not partake of the nature of a special deposit which may be identified, is mingled with the general funds of the bank. This deposit so mingled cannot be returned in the identical currency; its return is made in its equivalent of the same specie and quality. Money is a consumable (*fungible*) thing, even though its use does not imply its destruction. The use of money consists in spending it, in disposing of it, in investing it, all of which amounts to its consumption through acts of alienation. The consumption is natural when the thing is destroyed through its use, and civil when fictitious consumption, such as the use of money, is involved. A person who deposits money in a bank consents to its use, except when a special or specific deposit is made. This consent may not technically be called an express consent; but it is evident and clear and leaves no doubt with regard to the intention of the depositor. The sums so delivered become part of the general funds which the bank necessarily uses in its business, and over which it exercises acts of ownership. In the ordinary course of its transactions, the bank keeps its funds continuously moving. This is a fact known to the persons who deposit their money there, and if they wish to prevent the bank from acting as owner thereof they must manifest their intention by making a special deposit or one for a specific purpose.

These principles, which are in accord with the provisions of the Code of Commerce and supply a necessity and convenience in the dealings with banking institutions, have become firmly established in the American jurisprudence. According to numerous decisions, money generally deposited in a bank becomes the property of the latter and the rela-

tion of creditor and debtor between the bank and its client arises. Money, when delivered to a bank, ceases altogether to be the money of the principal; it is then the money of the banker, who is bound to return an equivalent by paying a similar amount to that deposited with him when he is asked for it. The money placed in the custody of a banker is, to all intents and purposes, the money of the banker, who may do with it as it pleases. The banker is not guilty of a breach of trust in employing it; he is not answerable to the principal if he puts it into jeopardy, if he engages in a hazardous speculation; he is not bound to keep it as the property of his principal, but he is answerable for the amount, because he has contracted, having received that money, to repay to the principal, when demanded, a sum equivalent to that paid into his hands. Such being the relative situations of banker and customer, the former is not an agent but a debtor. Lord Chancellor Cottenham, in *Foley* v. *Hill,* 2 H. L. Cas. 31.

However, there is a distinction between a general and a special deposit. In the first, title to the thing deposited passes to the bank. In a special deposit, the title remains in the depositor. When money or other property is deposited in a bank with the understanding that the identical money or property is to be returned, the deposit is a special one. A typical case of special deposit is that in which the money is delivered to the bank in a box or bag, with the express or implied understanding that the identical thing, and not its equivalent, is to be returned. There are cases, however, where such deposit may exist when the duty of the depositary is to keep, not the identical bills or coins, but an equivalent amount to be preserved intact for the use of the depositor. Modern jurisprudence is decidedly in favor of this doctrine. The old rule requiring the identification of the specific fund has been modified in such a manner that nowadays money specially deposited may be returned in an amount equivalent to that deposited, it being absolutely unnecessary to preserve

the same bills or coins in order to establish the identity. *Woodhouse* v. *Crandall*, 197 Ill. 104, 64 N.E. 292, 58 L.R.A. 385; *Genesee Wesleyan Seminary* v. *U. S. Fidelity & Guaranty Co.*, 247 N. Y. 52, 159 N. E. 720, 56 A.L.R. 964n; *Carlson* v. *Kies*, 75 Wash. 171; *Fogg* v. *Tyler*, (Me.) 82 Atl. 1008; *Shopert* v. *Indiana*, 41 Ind. App. 474; *Covey* v. *Cannon* (Ark.), 149 S. W. 514; *Massey* v. *Fisher*, 62 Fed. 958; *Schumacher* v. *Harriet*, 52 Fed. (2d) 817; *Bishop* v. *Mahoney*, 73 N. W. 6.

A general deposit must be returned when payment is demanded. It is very difficult at times to distinguish a general deposit from a special one. The difficulty lies in determining the intention of the parties. Deposits, however, are considered to be general unless the contrary has been agreed. The fact that the parties have intended that the money deposited follow the ordinary course of banking operations is an element to be considered in determining the nature of the deposit.

Technically, there is some difference between a special deposit and a specific deposit. The fact is that they produce the same effect, that the depositor continues as owner, and that it may be recovered as a trust deposit. Michie in his work "Banks and Banking," vol. 5, p. 638, in referring to specific deposits says:

"A deposit in a bank for some specific or particular purpose is sometimes termed a 'specific deposit.' It is said that a deposit for a specific purpose is neither general nor wholly special, but partakes of the nature of a special deposit to the extent that the title remains in the depositor and does not pass to the bank. The consequence is that the money if not applied or if misapplied, may be recovered as a trust deposit."

When the bank assumes the obligation of dedicating the funds to the intended purpose, there can be no transfer of title, for the bank lacks authority to dispose of the funds. A transfer of title is equivalent to a transfer of ownership, and if the bank is bound to dedicate the money to the purpose

specified by the depositor, it is plain that it does not even have a limited ownership on the amount deposited.

The intervener is of the opinion that this is a deposit which ought to be preferred under the law and paid by the receiver of Banco Comercial. As respects priorities, whether a deposit in a bank is general or special depends on the contract resulting from the mutual understanding and intention of the parties, or on circumstances sufficient to create a trust relation. Michie, Banks and Banking, vol. 3, p. 257.

As we have seen, the certificate of deposit issued by the bank does not depart from the ordinary form. According to the jurisprudence, a certificate of deposit is a written acknowledgment by a bank or banker of the receipt of a sum of money on deposit which the bank or banker promises to pay to the depositor, to the order of the depositor, or to some other person or to his order, whereby the relation of debtor and creditor between the bank and the depositor is created. *Maryland Finance Corporation* v. *People's Bank,* 128 S. E. 295; Michie, Banks and Banking, volume 5, p. 598.

We have consulted several cases during the time that we have devoted to the study of this matter. It is a general principle that a certificate of deposit creates a relation of debtor and creditor between the bank and the depositor. In the absence of evidence to the contrary, no other standard can be applied. We have been unable to find a single case upholding a different doctrine. However, in support of the contention that the money deposited by Eliseo Diez in the Banco Comercial constituted a specific fund, the following cases are cited:

*Prewett* v. *First Nat. Bank of Hagerman,* 262 Pac. 1057; *Russell* v. *Bank of Nampa,* 169 Pac. 180; *Powder Valley State Bank* v. *Hudleson,* 144 Pac. 494; *Iowa Mutual Liability Ins. Co.* v. *De la Hunt,* 196 N. W. 17; *Carlson* v. *Kies,* 47 L.R.A. (N. S.) 317; *Hitt Fire Works Co.* v. *Scandinavian American Bank,* 195 Pac. 13; *Plano Manufacturing Co.* v. *Auld,* 86 Am. St. Rep. 769; *State* v. *Grills,* 85 Atl. 281; *People* v. *City*

*Bank of Rochester,* 96 N. Y. 32; *Anderson v. Pacific Bank,* 112 Cal. 598. We have carefully examined these cases and none of them, in our belief, sustains such a conclusion. In some of them there was no controversy as to the nature of the deposit, and no question regarding priorities was decided. In all of them there was strong evidence. We shall discuss those on which a certain emphasis has been laid to support the theory of a specific deposit.

The question at issue in the case of *Prewett v. First Nat. Bank of Hagerman, supra,* decided by the Supreme Court of Idaho, was one of prescription. Henry Hosac purchased from M. M. Prewett, at public sale, 19 head of cattle. To secure the obligation contracted, Hosac mortgaged the same cattle. The sale was clerked by C. W. Stringfield, then cashier of the defendant bank; the promissory note and mortgage were prepared by him, executed at his request, and deposited in the bank until June or July, 1921. In March 1920, the plaintiff indorsed the note to J. W. Miller; he acquired it again in 1921, and continued to hold it since that time.

Subsequently, Hosac sold 12 head of cattle, 10 head of which pertained to the mortgaged cattle. Hosac advised plaintiff that the money received for the cattle covered by the mortgage, in the sum of $555.50, had been deposited in the bank in favor of Prewett. A check, representing the total proceeds of the sale, was indorsed by Hosac and delivered to the bank with instructions to apply $555.50 to the payment of the promissory note in favor of Prewett. Hosac explained to the bank that the $555.50 was the selling price of the cattle covered by the mortgage. Stringfield, the cashier, placed the money in Hosac's account, waiting for Hosac to give Prewett a check for said amount. On March 15, 1920, the bank changed its personnel. Stringfield retired as cashier and one H. O. Frazier took his place. Stringfield advised the new cashier and the new president of the bank that the money received from the proceeds of the cattle covered by

the Prewett mortgage, then on deposit in Hosac's name, belonged to Prewett and that the bank had no right to it. In spite of that, Frazier, the new cashier, applied the $555.50 to the payment of an obligation contracted by Hosac in favor of the bank. Prewett brought an action to recover the $555.50 deposited in the bank. The jury rendered a verdict in favor of plaintiff.

The question involved in that case had nothing to do with the nature of the deposit. The defendant alleged that the action had prescribed, and the trial court dismissed this defense. The appellate court held that, under the provisions of the law, when an action is brought to recover money or property deposited with a bank or banker, the statute of limitations does not begin to run until after demand by the depositor. The court also held that those provisions apply to special deposits as well as to general deposits; and further on, speaking on a point not within the issues presented by the case, it stated that when money is deposited in a bank to be paid to a third person, such a deposit is a special deposit. It then cited the cases of *Russell* v. *Bank of Nampa, supra,* and *Powder Valley State Bank* v. *Hudleson, supra.* We agree that when money is deposited for a specified purpose in favor of a third person, the deposit has the same character as a specific deposit. This doctrine is confirmed by the two cases cited by the Supreme Court of Idaho.

In *Russell* v. *Bank of Nampa, supra,* it is said that where a party who is indebted to a bank leaves with it, as security, notes belonging to him, and authorizes it to collect upon them and apply a portion of the proceeds to the payment of his debt, and instructs it not to deposit the balance, but to deliver it to a third person, and the cashier, contrary to such instruction, deposits the balance in the bank, such balance is not a "general" but a "special deposit." A clearer example of a specific deposit may not be offered.

In the case of *Powder Valley State Bank* v. *Hudleson, supra,* the evidence clearly showed what was the intention of

the parties. It is unnecessary to state in detail the facts of this case which are quite extensive. The bank brought an action to recover on a promissory note subscribed in its favor by the defendants. The latter alleged payment of the note and filed a cross complaint claiming $1,000 which the bank received and applied to the payment of an obligation contracted in its favor by Metzler–Hegsted Lumber Company. According to the evidence adduced, the bank was instructed that upon receipt of certain money the same should be set apart for the payment of a check issued in favor of the defendants, and the bank, far from so doing, disobeying the specific instructions received, applied the money to the payment of an obligation which that firm had signed, instead of paying the check of the defendants. Here the intention of the parties was evident as to the specific character of the instructions received by the bank, judging from the verdict of the jury, which weighed the evidence and decided the case in favor of the defendants.

In *Carlson* v. *Kies, supra,* decided by the Supreme Court of Washington, the facts were as follows: Fred Olson was administrator of the estate of Carl Peter Johnson and attorney in fact of the heirs Johanna Paulina Carlson and Nora Danielson. As such attorney in fact he obtained possession of the sum of $3,070.60 belonging to said heirs. One of the heirs resided in Sweden and the other in New York. Desiring to hold the money until the return of certain vouchers which he had forwarded to them, he placed the money in the bank and obtained a receipt written at his request and signed by the cashier as follows: "Vancouver, Wash., Dec. 14, 1910. Received of Fred Olson three thousand seventy & 60/100 dollars, to be held until receipts are received from heirs. Then same to be forwarded by bank draft. G. W. Daniels, Cashier. $3,070.60." The money was commingled with the funds of the bank, which closed its doors five days after receiving the money. The examiner took charge of the affairs of the bank until a receiver was appointed. A few days afterward, Ol-

son received the vouchers, presented the receipt to the bank, and demanded payment, which was refused. The cashier admitted that he knew that the money belonged to the Johnson heirs. The case was tried to the court. In addition to the facts stated, the court found that the money evidenced by the receipt had been deposited in the bank for safe-keeping pending the receipt of the vouchers, when it was to have been forwarded to the heirs by bank drafts; that the bank commingled the money with its funds; and that, prior to the commencement of the action, the receiver refused to comply with a demand for payment. Olson testified that he told the cashier that he desired to leave the money in the bank for safe-keeping pending the return of the vouchers, when he would purchase drafts for remittance to the heirs. The cashier admitted that he issued and delivered the receipt at the request of Olson. He further stated that he at the same time drew a certificate of deposit, which remained in the bank and which was tendered to Olson after the examiner had taken charge of the affairs of the bank. Olson testified that nothing was said about a certificate of deposit at the time the money was placed in the bank, but that it was offered him in exchange for the receipt after the examiner had assumed control.

No great mental effort is required in order to reach the conclusion that in the case cited the money was deposited in the bank for safe-keeping until the vouchers were received from the heirs, to whom the money deposited was to be forwarded by bank drafts. The deposit was a specific one. The court so found in view of the evidence adduced. As some stress has been laid upon the language used by the court in said case, we transcribe below its own words:

"A deposit in a bank is either general or special. Where a general deposit is made, it is either credited to the account of a depositor subject to his check, or evidenced by a demand or time certificate. The title to the deposit in such cases passes to the bank and it becomes the debtor of the depositor. On the other hand, when

a bank accepts a special deposit it becomes a trustee of the depositor, and holds the money subject to the trust. The receipt itself affords strong, if not conclusive, evidence of a special deposit. It shows that the money was placed in the bank for a special purpose. Fortified by the evidence of the depositor and the admitted circumstances here present, it is obvious that both parties to the transaction intended to make a special, and not a general, deposit. It follows, therefore, that the bank holds the money, not as a general debtor, but in a fiduciary capacity.''

We note that the court characterized as a general deposit one evidenced by a demand or time certificate, and we also note that it took as a basis the evidence adduced in order to reach the conclusion that the deposit was a special one. The court said that a receipt affords strong evidence of a special deposit, but it is clear that it did not refer to a certificate of deposit such as the one issued by the Banco Comercial, which is a negotiable instrument payable to the order of the person in whose favor it was issued. The court referred to an ordinary receipt like that issued by the cashier of the Commercial Bank of Vancouver and to the evidence introduced showing that it was the intention of the parties to constitute a special, and not a general, deposit.

In the paragraph following the one above quoted, the same court went on to say:

''A deposit is not special unless made so by the depositor, or unless made in a particular capacity. . . In using deposits made for the purpose of having them applied to a particular purpose, the bank acts as the agent of the depositor, and, if it fail to apply it at all or misapply it, it can be recovered as a trust deposit. This view was recognized by this court in the *Blake* case, where it was said: 'If it had been delivered to the bank, not as a general deposit, but for a particular purpose, it would have been a trust fund in the first instance, and the title would not have passed to the bank; but even then it could not have been recovered without showing that it had gone into the hands of the receiver.''

In the case of *Plano Manufacturing Co.* v. *Auld, supra,* the bank took the necessary steps and collected a promissory

note delivered by plaintiff for that purpose shortly before closing its doors. The sum of $879, amount of the obligation, was demanded of the receiver of the bank, and payment was refused. The bank had also received from other persons other obligations for collection. When the receiver took possession of the assets of the bank, he found only $2,185.37 in cash. The property of the bank, including money, promissory notes, and other effects at the time of its failure, amounted to $25,000. Its liabilities totalled $45,000. On appeal the court held that, according to an invariable rule, money deposited by a general customer, or collected for him upon a note with the understanding that the same shall be passed to his account, kept subject to check, the entire amount belongs to the bank, and the relation of debtor and creditor is created. The court then cited a distinction made by Mr. Thompson, with which we are entirely in accord, to the effect that where the person who sends the paper to the bank for collection has no general deposit with the bank, it can not reasonably be assumed that the deposit is a general one. Of course, when the bank assumes the responsibility of collecting an obligation, it does so with a specific purpose, and is under the duty of returning the money to the owner of the obligation as soon as it is collected. However, if such person has a checking account in the bank and requests that the obligation be collected with the understanding that the money should go to the general funds, it is unquestionable then that the relation of debtor and creditor is established and that the deposit is a general one. When a banking corporation undertakes to collect an obligation in favor of a third person, it becomes the latter's agent, unless the amount collected is credited to the checking account of said person. Although in the case at bar quite a different question is involved, it cannot even be argued, in favor of the existence of a specific deposit, that Eliseo Diez did not have an account in the bank, because there was absolutely no evidence on this point, and in any event

because the party that alleges a preference, based on the existence of a specific deposit, is bound to prove it and to rebut the prevailing presumption, until the contrary is shown, that the deposit is a general one.

In *People* v. *California Safe Deposit & Trust Co.*, 137 Pac. 1111, decided by the District Court of Appeal, Third District, California, there was issued a certificate of deposit similar to that issued in the instant case by the Banco Comercial de Puerto Rico. There, as in the case at bar, the deposit was made payable to the order of the person in whose favor the certificate was drawn. The case was submitted to the Supreme Court of California in bank, on a motion for rehearing which was denied. According to the evidence introduced in that case, the depositor, the firm of Aitken & Aitken, advised the bank that it wanted to have the money sent to Mrs. Emma J. White, at the city of Tacoma. A certificate of deposit was suggested by the employees of the bank. One of the members of the firm drew a check on the bank against funds it had therein and delivered the check to an employee of the bank, receiving in exchange, as had been suggested, a certificate of deposit payable to the order of Mrs. Emma J. White. The California court did not consider the transaction as constituting a special deposit entitled to a preference. The certificate issued in that case was as follows:

"Uptown Branch, California Safe Deposit & Trust Company, 1740 Fillmore Street, South of Sutter. San Francisco, California, Oct. 29, 1907. No. 585. This is to certify that Aitken & Aitken have deposited with California Safe Deposit & Trust Company of San Francisco, California, the sum of eight hundred forty-seven 50/100 dollars ($847.50). Payable to the order of Mrs. Emma J. White in lawful money of the United States on the return of this certificate properly indorsed. (Signed) S. H. Patterson, Accountant. G. Chevassus, Branch Manager. Not subject to check. Certificate of deposit. Payable without interest. Payable only through San Francisco Clearing House."

The California court in an exhaustive opinion discussed the question raised and stated that the appellant had cited two cases which favored its contention: *People* v. *City Bank of Rochester, supra,* and *Stroller* v. *Coates,* 88 Mo. 516. In the New York case, the firm of Hartwell, Hough & Co. had funds on deposit in the City Bank of Rochester. Said firm drew a check against its own account and delivered it to the bank to be applied in payment of a certain promissory note against the firm which had been discounted by the bank. The latter received the check, stamped it as paid on November 3, 1882, and at the same time made an entry on its books to the effect that the note had been paid on that date. A similar transaction was made with regard to another note that the bank had discounted and was paid by a check of the same firm. However, at the time of these transactions the bank had lost possession of the notes, without the consent of the firm, which paid them in the belief that the documents were still in the hands of the bank. It will be clearly seen that in said case the deposit was made for a specific purpose and that the bank withdrew an amount from the firm's account and used it to pay the obligations, and acknowledged it in writing. After these operations were carried out the bank was declared insolvent and the receiver refused to pay the obligations that had already been marked as paid on its books. The New York court in deciding this question, expressed itself thus:

"The checks of the petitioner were money assets in the hands of the bank and were so treated by all of the parties. They were delivered to it with specific directions to apply the proceeds on payment of the notes. Those directions were assented to by the bank officer and the checks collected from that fund. From that moment the bank was bound to hold the money for and apply it to that purpose, and no other, or failing to do so, return it to the petitioner. As to it the bank was bailee, or trustee, but never owner."

It was held that the notes should be paid out of the funds in the hands of the receiver. "Here," says the California

court, "was a clear agreement by the bank to apply the proceeds of the checks to a specific purpose. In the present case we find no such agreement."

Let us examine now the facts in the case of *Stroller* v. *Coates, supra,* as the same have been stated by the California court. One Earnest, of Colorado, consigned to plaintiff, under the firm name of Stoller & Hill, of Kansas City, ten car loads of cattle, to be sold for his account. Stoller & Hill were requested, by instructions accompanying the consignment, to deposit the proceeds of sale in the Exchange Bank of Colorado to his (the assignor's) credit. The gross proceeds amounted to $3,769.75, in the form of a draft. Stoller & Hill took the draft to the Mastin Bank for the purpose of carrying out their instructions. The net proceeds due the consignor were a little less than the draft. They deposited the draft to their credit and immediately drew a check for the net proceeds to be transmitted to the consignor in Colorado. With the check they requested the bank to place the proceeds in the Exchange Bank of Denver, in Colorado, to the credit of Mr. Earnest, the consignor. The Mastin Bank agreed to do this. The Mastin Bank failed before the money was paid, and it was held that a special deposit was constituted. The Missouri court said:

"When Stoller & Hill drew their check for $3,757.56 on the Mastin Bank and delivered the same to the bank, payable to the bank or indorsed over to it, they placed a specific fund in the hands of the bank. The bank was also advised sufficiently that Mr. Earnest was the ultimate owner or beneficiary of the fund. The bank agreed to transmit this fund to the Exchange Bank of Denver, to be received by said bank for the use of Earnest."

Commenting on the above facts, the California court said:

"There was not only in that case a deposit of what was treated as money at the moment of drawing the check but an agreement of the bank to transmit the fund. Both of these features are wanting in the present case."

It is true that the California court laid emphasis on the fact that Aitken & Aitken withdrew from their account in the bank a certain sum to purchase a certificate of deposit issued in favor of Mrs. White, and that the funds of the bank were not increased; but it is no less true that the court ended its opinion with these words:

"It was perhaps not necessary for the Aitkens to enact the idle and useless ceremony of receiving the money on their check and immediately passing it back to the bank in order to have impressed the fund with a trust and to have made the bank the agent of Mrs. White for the transmission of the money. But they should at least have clearly placed the responsibility upon the bank of remitting the money, as was done in the Missouri case, in order to constitute it a specific fund in its hands."

The language of the opinion shows that if the evidence had established that the bank was entrusted with the transmission of the funds to Mrs. White, the court would have regarded the deposit as a specific one and given preference to it as such, without considering the fact that Aitken & Aitken withdrew a certain sum from its own account in order to acquire the certificate, and that the funds of the bank were not increased. The distinction is important. When money is deposited in a bank, not with the specification that the same should remain in its possession, but for transmission to a third person, the deposit is specific. When the bank assumes the obligation of transmitting the money, it accepts a trust it cannot evade and acts as an agent entrusted with a specific duty. In the instant case the Banco Comercial de Puerto Rico was not bound to do anything, except to carry out the ordinary obligation of payment when the certificate of deposit was presented by the person in whose favor it was issued or by an indorsee.

In the Missouri and California cases there was evidence to show the intention of the parties. In the case from Missouri the bank agreed to comply with the instructions re-

ceived of forwarding the funds to the Exchange Bank of Denver. In the California case evidence was offered to show that the money was to be sent to Mrs. White at Tacoma. The court, however, did not find that the bank agreed to transmit the money and, in spite of the evidence introduced, it held that a specific deposit had not arisen. In the case at bar there is a complete absence of proof, that is, no other evidence except the certificate of deposit was presented. With the exception of this certificate, there is nothing in the record that might enlighten us with respect to the intention of the parties. A general deposit is involved which must follow the usual course of ordinary bank dealings. It does not differ from the customary form used by banking institutions in issuing a certificate of deposit at the request of a customer.

We hold, in short, that a certificate of deposit considered alone, carries with it the presumption of a general deposit. If a specific deposit is desired to be proved, the general presumption must be rebutted by evidence as to the intention of the parties. As the California court said in the cited case, something more than the intention of a party at the time of making the deposit is necessary. It must be shown that the intention of both parties concur, either expressly or impliedly. And as the Supreme Court of Wyoming said in the case of *Gray* v. *Elliott,* 53 A.L.R. 554, decided in 1927, special circumstances must exist in order to make the deposit special instead of general, and, inasmuch as equality is equity, courts have been careful to limit the number of special circumstances which will create a special instead of a general deposit.

In defining a certificate of deposit no distinction is made either by the courts of justice or by the text writers. The mere certificate does not establish a trust relation. The general rule is that a certificate of deposit creates the relation of debtor and creditor between the bank and the depositor. In the instant case no evidence has been adduced to rebut

this presumption, if exception is made of the certificate of deposit, which by itself is mere evidence of a general deposit. In all the cases cited to us in support of the theory of a specific deposit, abundant evidence was produced. Those cases, when considered in detail, entering into the merits of the questions discussed and of the evidence adduced, confirm the conclusions that we have reached herein, without having before us other evidence as to the intention of the parties than the certificate of deposit issued by the Banco Comercial.

In conclusion, we quote the statements of the District Court of Appeal of California, in the above cited case, regarding the evidence adduced in connection with the certificate of deposit, thus:

"If it could be reasonably inferred from Mr. Aitken's testimony that, notwithstanding the fact that the certificate of deposit strongly rebuts the idea of a trust relation, his intention was to create such trust, and what he said and did was so understood by the bank or must be presumed to have been so understood by it from what was said and done, we think the rules of law would require of us to accept such understanding of the parties. But we fail to discover in anything said or done by Mr. Aitken at the time from which he had a right to assume that the bank officers understood the bank's relation to Mrs. White to be other than that created by the certificate of deposit. The certificate of deposit has none of the earmarks of a special deposit of money which the bank had no right to mingle with its funds or treat as its own. On its face it creates the relation of debtor and creditor between itself and Mrs. White. Aitken & Aitken were her agents in the matter and for her consented that the transaction should take this form, and it seems to us the certificate is very significant, if not conclusive, as showing what the understanding was.

"Mr. Morse says such certificates are but acknowledgments of the bank that it has received from certain persons certain sums of money. 'In form they are substantially simple receipts of the bank, in negotiable form, for so many dollars, and so are only evidence of an indebtedness, like the bank book.' 1 Morse on Banks, par. 297. 'They create no trust relation between the depositor and the bank, but merely that of debtor and creditor.'"

Michie in his work "Banks and Banking," vol. 5, page 607, says:

"Where a certificate of deposit recites that the depositor has placed a certain sum in the bank, payable in current funds on the return of the certificate properly indorsed, such deposit is a general deposit, and, the bank becoming insolvent, the depositor must be remitted to the position of a general creditor only."

Under our civil law, where money is ordinarily deposited in a bank, the transaction—which in American jurisprudence is known as a general deposit—does not constitute a *depositum*. In the ordinary course of business, the person who regularly deposits money in a bank consents to its use by the bank. When the depositary has permission to make use of the thing deposited, the contract loses the character of a *depositum* and becomes a loan or a *commodatum*. The irregular deposit or the deposit of consumable things, which had its origin in the civil law, is very similar to, if not identical with, the general deposit mentioned by the American decisions. In both consent has been given to make use of the thing bailed and in both ownership is transferred, the contract becoming a loan. García Goyena affirms, and Manresa admits, that the irregular deposit has been discarded, and it will be well to remember that the contract partakes of the nature of a loan when express permission has been given to make use of the thing deposited, according to the Civil Code, or when consent (*asentimiento*) of the depositor is given, according to the Code of Commerce. However, when the intention to create a special deposit is apparent, it is logical that the wish of the parties should prevail and that the juridical relation of bailor and bailee be recognized. When the parties express their intention to constitute a *depositum,* the contract does not cease to be such, although it may deviate somewhat from the ordinary principles regulating it, and although it be understood that the depositary instead of returning the identical coins received, may return others of the

same quality. This is the tendency of modern American jurisprudence, and is not incompatible, in our opinion, with our civil law. The banks existing in Puerto Rico have been organized and do business under the banking system of the United States. In matters of deposits, these organizations are governed by general principles which are rather of a universal character, for they are not essentially different from those adopted in other countries.

Under a judicious application of those principles to the case at bar, we are of the opinion that it has not been shown that there is involved herein the real deposit known to the civil law or the specific deposit recognized by the American jurisprudence, and the judgment appealed from must be affirmed.

Mr. Justice Wolf and Mr. Justice Aldrey dissented.